UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**MAURICE CLIMES,**

    **Petitioner,**

**v.**                                                    **Case No. 8:22-cv-1593-MSS-TGW**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

    **Respondent.**

_____/

## O R D E R

Climes filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state court convictions. After reviewing the petition (Doc. 1), the response (Doc. 8), Climes's construed reply (Doc. 17), and the relevant state court record, the Court **DENIES** the petition.

## PROCEDURAL HISTORY

A jury found Climes guilty of armed burglary, burglary of a dwelling, grand theft of a motor vehicle, and fleeing and eluding a law enforcement officer (Doc. 8-2 at 1846–48), and the trial judge sentenced Climes to life in prison for the armed burglary conviction, a consecutive thirty years in prison for the burglary of a dwelling conviction, a consecutive ten years in prison for the grand theft of a motor vehicle conviction, and a consecutive thirty years in prison for the fleeing and eluding a law

1

enforcement officer conviction. (Doc. 8-2 at 1966–70) Climes appealed, and the state appellate court affirmed the convictions and sentences. (Doc. 8-2 at 1973)

The post-conviction court granted in part and denied in part Climes's motion to correct a sentence under Rule 3.800(a), Florida Rules of Criminal Procedure (Doc. 8-2 at 2155–57), and the trial judge amended the sentence for the grand theft of a motor vehicle conviction to run concurrently with the sentences for the other convictions. (Doc. 8-2 at 2166–72) Climes appealed the order denying in part his Rule 3.800(a) motion, and the state appellate court affirmed. (Doc. 8-2 at 2198)

The post-conviction court denied Climes's motion for post-conviction relief under Rule 3.850, Florida Rules of Criminal Procedure (Doc. 8-2 at 2387–92, 2433–44, 2529–36, 2608–15), and the state appellate court affirmed. (Doc. 8-2 at 2858) Climes's federal petition follows.

## FACTS

Climes proceeded to trial with a co-defendant, Anthony Stewart. The evidence at trial proved the following.

On December 9, 2012, in the late evening, Angella Jackson woke up with a gun pressed against her head. (Doc. 8-2 at 696–97, 706–07) Two armed males dressed in black clothes tied Jackson up, demanded money, and asked for Jackson's boyfriend. (Doc. 8-2 at 702, 709–11) Jackson recognized one of the males because earlier that day she had seen the male and another male walk by her home. (Doc. 8-2 at 704–05, 707–08) Jackson saw a tattoo under the male's eye. (Doc. 8-2 at 717–18) Jackson could not see the other male's face. (Doc. 8-2 at 718) Jackson sent a text message to her

2

boyfriend about the burglary and saw police officers outside her home. (Doc. 8-2 at 711–13, 739) The armed males stole $680.00 in cash and a black duffel bag and fled out of a door on the side of the home. (Doc. 8-2 at 720–21, 734–36, 740)

Earlier that day, Jackson's boyfriend also saw two males dressed in black clothes walking by Jackson's home. (Doc. 8-2 at 801–04, 806–07) That evening, Jackson's boyfriend drove his car into the driveway of Jackson's home and saw Jackson inside the home, tied up, and next to two males. (Doc. 8-2 at 811–16) Jackson's boyfriend saw a Dodge Charger circling the block. (Doc. 8-2 at 829–30) After Jackson's boyfriend received the text message from Jackson about the burglary, he called the police. (Doc. 8-2 at 818–19, 825) After police officers arrived, Jackson's boyfriend saw the two males run out of a door on the side of the home and into an alley. (Doc. 8-2 at 832)

A police officer who arrived at the scene saw persons moving inside the home, approached the home with his gun drawn, saw blinds in the front windows quickly shut, and heard a loud sound from the rear of the home. (Doc. 8-2 at 864–68) The officer observed two males dressed in black clothes running down an alley with a duffel bag. (Doc. 8-2 at 868–73) Another officer observed the males enter a Dodge Charger with the bag. (Doc. 8-2 at 930–31, 944–50) A police pursuit with the Dodge Charger ensued on the interstate and into a neighborhood until the Dodge Charger crashed and stopped at a driveway of a home. (Doc. 8-2 at 950–59, 994–97) An officer saw the doors of the Dodge Charger open and a male exit the Dodge Charger and run behind the home. (Doc. 8-2 at 997–99)

That same evening, Jeremy Reed awoke when he heard a loud bang and his fiancé's screams. (Doc. 8-2 at 1143–44, 1265–66) Reed saw a male with "gold teeth and white eyes" standing at the foot of their bed. (Doc. 8-2 at 1144) Reed fought to remove the male from the bedroom where his newborn baby slept. (Doc. 8-2 at 1144–46, 1268) Reed's fiancé hid with their baby in a closet and called 911. (Doc. 8-2 at 1269, 1273) A second male with a tattoo on his face entered the room, and the two males grabbed keys to a Mazda and left. (Doc. 8-2 at 1146–52)

Another police pursuit ensued with the Mazda. (Doc. 8-2 at 880–81, 961–63, 1053–70) Over a dozen law enforcement vehicles pursued the Mazda until the Mazda slowed to a halt because of a flat tire. (Doc. 8-2 at 885–87, 963–75, 1070) The driver of the Mazda abandoned the vehicle and attempted to run away until a police officer in a SUV struck the driver. (Doc. 8-2 at 888–89, 975–76, 1070–71) The driver attempted to hijack another vehicle, but police officers tackled the driver, arrested him, and identified him as Climes. (Doc. 8-2 at 889–90, 977–79, 1071) A police officer arrested the passenger of the Mazda and identified him as Stewart. (Doc. 8-2 at 896–98)

In a parking lot, police officers showed Climes and Stewart to Jackson, and Jackson identified both as the males who entered her home and robbed her. (Doc. 8-2 at 743–44, 934–35) Also, Jackson identified Stewart in court. (Doc. 8-2 at 744–45) Jackson later realized that she mistakenly identified Climes because she had seen Climes walking by her home with Stewart earlier that day. (Doc. 8-2 at 752–54)

4

Also, the police officers separately showed Climes and Stewart to Reed and his fiancé. Reed identified both Climes and Stewart as the males who entered his home and stole the Mazda. (Doc. 8-2 at 1172–76, 1302–04) Reed's fiancé only identified Climes. (Doc. 8-2 at 1279, 1304–06) After Climes's arrest, a police officer found in his pockets $660.00 in cash, a mobile telephone, a set of car keys, and a single car key for a Dodge Charger. (Doc. 8-2 at 1356–57) The officer was able to start the abandoned Dodge Charger with the car key found in Climes's pocket. (Doc. 8-2 at 1004–05, 1375–76) The police officer asked Climes for his name, and Climes responded: "[Y]'all motherfuckers wouldn't have got me if my Charger didn't blow a tire. Take me to 49th Street. You know what I did and do. And I'm going away for a long time, so fuck y'all." (Doc. 8-2 at 1360–62)

A police officer found a black duffel bag next to the passenger door of the wrecked Dodge Charger, guns and ammunition inside the duffel bag, and gloves, duct tape, a crowbar, a loaded handgun, a mask, and a black long-sleeved shirt inside the car. (Doc. 8-2 at 999–1000, 1002–03, 1380–84) Three fingerprints on the duct tape found inside the Dodger Charger matched Climes's fingerprints. (Doc. 8-2 at 1419–20) DNA profiles from swabs of the steering wheel, interior door handle, and gear shifter of the Dodger Charger matched Climes's DNA profile. (Doc. 8-2 at 1502–03, 1518) A mixed DNA profile from a mask found inside the Dodge Charger matched Climes's DNA profile as a major contributor. (Doc. 8-2 at 1509–10, 1512, 1518) A mixed DNA profile from a hat recovered near Reed's home matched a DNA

5

profile for Arsenio Brinson as a major contributor. (Doc. 8-2 at 1092–97, 1397–98, 1515)

During the defense's case in chief, Climes introduced into evidence a booking photograph of Arsenio Brinson and an inmate account statement that demonstrated that Climes entered jail with $660.00. (Doc. 8-2 at 1584–85, 1588–89) In closing, Climes argued that the witnesses' identifications were unreliable, that no physical evidence proved that he entered the homes, that Brinson committed the crimes, and that reasonable doubt supported an acquittal. (Doc. 8-2 at 1720–52)

## STANDARDS OF REVIEW

**AEDPA**

Because Climes filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

6

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly established federal law refers to a holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Climes asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984), requires a defendant to demonstrate both deficient performance and prejudice:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"[T]here is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A defendant cannot meet his burden by showing that the avenue

8

chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on a state procedural ground, the federal court instead denies the claim as procedurally defaulted. *Snowden v.*

9

*Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). Also, a petitioner's failure to comply with a state procedural rule governing the proper presentation of a claim bars review of that claim on federal habeas. *Coleman*, 501 U.S. at 729. "[A] state court's rejection of a federal constitutional claim on procedural grounds will only preclude federal review if the state procedural ruling rests upon [an] 'independent and adequate' state ground." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).

To excuse a procedural default on federal habeas, a petitioner must demonstrate either (1) cause for the default and actual prejudice from the alleged violation of federal law or (2) a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

## ANALYSIS

### Ground One

Climes asserts that the trial judge violated his federal rights by failing to comply with *Faretta v. California*, 422 U.S. 806 (1975). (Doc. 1 at 5) He contends that the trial judge failed to hold a hearing during every critical stage of the case. (Doc. 1 at 5)

The Respondent argues that the claim is procedurally barred because Climes failed to assert the claim based on *Faretta* on direct appeal. (Doc. 8 at 22–24) The Respondent contends that, on direct appeal, Climes argued only that the trial judge

10

violated his federal rights by appointing standby counsel over Climes's objection. (Doc. 8 at 22)

In his brief on direct appeal, Climes raised three issues concerning his right to self-representation. For issue two in the brief, Climes asserted that the trial judge erroneously refused to allow Climes to act as co-counsel with an attorney whom he retained. (Doc. 8-2 at 1996–97) For issue three, Climes asserted that the trial judge erroneously refused to allow Climes to represent himself at trial without standby counsel. (Doc. 8-2 at 1998–2002) For issue four, Climes asserted that the trial judge erroneously denied his motion to continue trial to retain another attorney to act as standby counsel. (Doc. 8-2 at 2002–04)

On direct appeal, Climes did not assert that the trial judge violated his federal rights by failing to hold a *Faretta* hearing during every critical stage of the trial. Because Climes failed to assert the specific factual and legal basis of his *Faretta* claim, he failed to fairly present the claim on direct appeal. *Kelley v. Sec'y, Dep't Corrs.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004) ("We simply require that petitioners present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation."). *Green v. Sec'y, Dep't Corrs.*, 28 F.4th 1089, 1135 (11th Cir. 2022) ("Presentation of a claim 'under the same general legal umbrella but with entirely different factual underpinnings [ ] does not constitute fair presentation of the . . . claim.'") (citation omitted).[1]

---

[1] Climes contends that he raised the claim in a petition alleging ineffective assistance of appellate counsel under Rule 9.141(d), Florida Rules of Appellate Procedure.

11

If Climes returned to state court to assert the *Faretta* claim, the post-conviction court would dismiss the claim as procedurally defaulted. Fla. R. Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence."). Consequently, the claim is procedurally defaulted on federal habeas. *Snowden*, 135 F.3d at 736. Because Climes fails to argue that either cause and prejudice or a miscarriage of justice based on actual innocence excuses the procedural default, the claim is procedurally barred on federal habeas. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.

Even if the claim is not procedurally barred, the claim is meritless. During a pretrial hearing, Climes first asked the trial judge if he could act as co-counsel to the attorney whom he retained. (Doc. 8-2 at 91) The trial judge denied the request because, under Florida law, a defendant is not entitled to hybrid representation. (Doc. 8-2 at 91) *See Logan v. State*, 846 So. 2d 472, 475 (Fla. 2003).

Climes next asked the trial judge if he could represent himself, and the trial judge engaged in the following colloquy with Climes (Doc. 8-2 at 91–99):

| | |
|---|---|
| [Climes:] | Well, I would like to dismiss counsel, sir. |
| [Trial judge:] | So now, we're going to decide — based on your most recent performance we're |

(Doc. 1 at 5) However, a *Faretta* claim based on trial error materially differs from an ineffective assistance of appellate counsel claim. *Compare Strickland*, 466 U.S. at 687, *with Faretta*, 422 U.S. at 835. Also, because a *Faretta* claim would not succeed on direct appeal, appellate counsel did not deficiently perform. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017).

going to decide whether you want to go *pro se*, is that what you're indicating?

[Climes:]    I mean, I would like to exercise my right, Your Honor.

[Trial judge:]    To do what? To go *pro se*?

[Climes:]    Yes.

[Trial judge:]    All right. Then, let's get under oath, and we'll have a discussion about that, because there's lots of questions I got to ask you [ ]. Raise your hand.

(Defendant sworn.)

[Trial judge:]    All right. What's your legal [and] educational background, Mr. Climes?

[Climes:]    I have a GED, sir.

[Trial judge:]    You have a GED with no formal legal training whatsoever, right?

[Climes:]    Nope.

[Trial judge:]    No college, no law school —

[Climes:]    No, sir.

[Trial judge:]    — no law degree, no certification as an attorney, right?

[Climes:]    No, sir.

[Trial judge:]    Okay. And you conducted how many trials yourself in the past?

[Climes:]    None.

[Trial judge:]    Have you picked a jury before?

13

[Climes:]          No, sir.

[Trial judge:]     Have you cross-examined witnesses before?

[Climes:]          No, sir.

[Trial judge:]     Do you understand that you're held to the standard of an attorney if you're going to do all of these things? You don't get to say, "Hey, I've never done this before, I need some help. You know, you got to bend the rules for me here." You get the same rules that the lawyers get in this case, [ ] you understand that, right?

[Climes:]          Yes, sir.

[Trial judge:]     Mr. Piazza's been here — How long have you been prosecuting cases, Mr. Piazza?

[Prosecutor:]      Twenty-nine, Your Honor.

[Trial judge:]     Twenty-nine years. So, he has the benefit of law school experience, law school degree, twenty-nine years of experience trying hundreds of cases. You have none of that. You're going to be at a disadvantage, [ ] you understand all of that, right?

[Climes:]          I hear you, sir.

[Trial judge:]     You're facing a sentence that includes what? Up to life in prison — or it's [ ] mandatory life in prison as a prison releasee reoffender, if he's convicted, is that right, State?

[Prosecutor:]      That is correct, Judge. And there's also [habitual offender] with life, as well.

14

[Trial judge:]  All right. So, you're facing a mandatory life sentence if you're convicted as charged. Do you understand that, as well?

[Climes:]  Yes, sir.

[Trial judge:]  All right. You have never cross-examined witnesses, you haven't called witnesses. You know what statute number the rules of evidence are contained under?

[Climes:]  No, sir.

[Trial judge:]  Okay. Well, the rules of evidence are going to decide what evidence gets admitted in the trial, you understand that, right?

[Climes:]  Yes, sir.

[Trial judge:]  So, you have no idea even what statute number the rules of evidence are covered under.

[Climes:]  I —

[Trial judge:]  Apparently, you have some passing reference to the rules of criminal procedure because you incorrectly talked about wanting or needing something sworn to by the State under the rules of criminal procedure, right? So, you at least know where the rules of criminal procedure are located, correct?

[Climes:]  Yes, sir. I'm referring to — just like you said, I should have a right to cross-examine a witness and by —

15

[Trial judge:]    Oh, you'll have a right.

[Climes:]    — this being a testimony that's said under oath, you know, essential to my case, the base of the case. This is the material witness statement. This is the base of my case, how can I not be able to cross-examine a witness off of it, if it's going to be made? You're saying I don't have a right to cross-examine the witness off of the testimony that they've stated under oath?

[Trial judge:]    I'm asking you about your basic understanding of how this process works, so that I can at least make a record that suggests that you're making an informed decision about wanting to represent yourself. So, I have to tell you all of the things that you're going to be doing if you conduct your own representation, explain to you that you have no experience doing it, no background doing it, no knowledge about it.

[Climes:]    I understand.

[Trial judge:]    And then if you want to go ahead and make that kind of decision, that's your decision to make. But I am obliged to tell you what the potential pitfalls and possible problems could be with you deciding to self-represent in the case. So, that's what I'm attempting to go through.

What you're facing is a penalty, how the trial's going to go, what you're going to be asked to do, the fact that you have no experience doing it, those are all of the things we're talking about, so that you can go, "Wow, I wonder if

16

this is really a good decision or not," and then you can make a decision about whether you want to do it or not.

Because no matter how bad a decision it is, and how stupid a decision it is, constitutionally you have the absolute right to make that decision if you choose to do that. But you're going to be held to the standards of an attorney, you clearly have demonstrated that you know — that the old adage, a little bit of knowledge is a dangerous thing, just in our conversation today related to the whole swearing of witnesses and what needs to be done with the filing of an information.

And so, I fear that that's what's going to happen throughout this entire process if you go ahead and choose self-representation, but I can't stop you from doing it. Once I've told you all of these things, told you how it's going to go, what's going to happen, and what's required, if you still make the decision you want to represent yourself, you're entitled to. So you understand all of that, right?

[Climes:]          Yes, sir. I hear you. Yes, sir.

[Trial judge:]     And so your decision is what? You want to go ahead and represent yourself?

[Climes:]          I would like to have my own lawyer as a co-counsel —

[Trial judge:]     No.

[Climes:]          — in my case.

17

[Trial judge:]    You're either doing it yourself, or she's doing it. There's no co-counsel. It's not recognized by the law, it's not allowed under the law, and it sure as heck isn't going to happen in this courtroom.

So, if you want to do it, you're doing it on your own. She can sit with you, [and] she can sit there and give you technical advice, I suppose, but you're not both conducting the trial. You're not doing some of it, and she's doing some of it. Either you're doing it all, and she can sit there with you and give you technical advice, or she can do it and you can consult with her as a team, which is typically how it works, and she's got the experience doing it.

And frankly she's got good experience doing it. She's won a number of cases in front of me in the last two years, but if you want to go ahead and go on your own and fly solo on your own with her just sitting there, that's your choice. It's a foolish choice, but constitutionally you're entitled to make it if that's what you want to do.

[Climes:]    Okay.

[Trial judge:]    It's up to you.

[Climes:]    I'm going to look further into it, and I'll speak with her. I mean if I feel like the job is not being done, Your Honor, I would be, you know, getting back in touch with the court.

[Trial judge:]    All right. So, at this point, you're not telling me that you want to elect self-representation, right?

18

| [Climes:] | Right, at this moment, but I'm telling you — |
|---|---|
| [Trial judge:] | I understand. |
| [Climes:] | — for future reference that I might want to. |
| [Trial judge:] | All right. Then you — when you want to go *pro se*, then you tell us that you've made that decision. At this point, you're not indicating that you want to do that, so Ms. McCabe will remain. |

At a hearing about two months later, trial counsel informed the trial judge that Climes wanted to represent himself, and the trial judge engaged in the following colloquy with Climes (Doc. 15-2 at 5–18):

| [Trial judge:] | All right. Mr. Climes has joined us on his case which is set — well, he's got some cases, right? |
|---|---|
| | He's set for trial on the armed burglary, robbery, grand theft [of a] motor vehicle, [and] burglary on [Case Number] 12-21706 on October 6. |
| | He's also got some other cases that are pending, right? A couple of [failure to appears] under [Case Numbers] 12-17575 and 17671. I think there's — isn't there a trafficking — |
| [Prosecutor:] | Trafficking. |
| [Trial counsel:] | Trafficking. |
| [Trial judge:] | — [Case Number] 12-2478. And some infractions and some other stuff, but the main case that's set for trial is |

19

|  | October 6. You have been retained to represent him, right? |
|---|---|
| [Trial counsel:] | Yes, Your Honor. |
| [Trial judge:] | He filed a motion to dismiss counsel. And I don't know that I need to have a *Nelson* hearing. |
|  | I mean, when you're retained, if he wants to fire you, he can fire you. Then the only question is whether he wants to hire someone else or he needs me to appoint the public defender. |
| [Prosecutor:] | Judge, I think you would have to allow counsel to withdraw, though. |
|  | If he fires her, you still have to allow — you have to make a decision that counsel is — to withdraw counsel. And even if — |
| [Trial judge:] | Yeah. I mean, so where are we in this relationship? |
| [Trial counsel:] | Your Honor, my understanding is he wishes to be *pro se* with me as standby counsel. I've discussed this with him. I don't have any objection to that. I think that — |
| [Trial judge:] | This is not a co-piloting situation. Okay? |
| [Trial counsel:] | I think that the issues arise from the motion that was previously filed, argued by me, [and] won, regarding the material witnesses, and he has some other issues with — and he can obviously correct me if I'm wrong — |

20

[Trial judge:]    Well, remind me what we're — what we're talking about because —

[Trial counsel:]    The arraignment.

[Trial judge:]    What did I — what am I missing?

[Trial counsel:]    Well, you can tell him.

[Climes:]    I'm just — sir —

[Trial judge:]    I mean, if this is because he wants to reargue —

[Climes:]    I would just —

[Trial judge:]    Hold on.

[Climes:]    Yes, sir.

[Trial judge:]    I don't remember what the motion was.

[Prosecutor:]    Just, it was a motion to get the green — [ ] green sheet or —

[Trial counsel:]    It's a material witness.

[Prosecutor:]    — of our material witness that led us to filing the information.

[Trial judge:]    Okay. So, what —

[Prosecutor:]    He wanted any statement written that we got from the witness. Okay?

[Trial judge:]    So, he wants to represent himself so that he can reargue that same motion?

[Trial counsel:]    Yes, sir. I think he also has issues —

21

| | |
|---|---|
| [Trial judge:] | Because that's not happening. I'm going to stick with whatever ruling I have. |
| [Climes:] | Yes, sir. |
| [Trial judge:] | I'm not having a rehearing on a motion that I've already decided. I mean, if I'm wrong, I'm wrong. And if and when he gets convicted, an appellate court will say, "Hey, Judge, you're wrong," but you don't just get to keep arguing the same thing over and over again. |
| [Climes:] | Yes, sir. But sir, I'm not trying to reargue a motion that I argued, sir. I just wish to exercise my right to represent myself, sir. |
| [Trial judge:] | All right. Well, then there's some things we need to talk about — |
| [Climes:] | Yes, sir. |
| [Trial judge:] | — because that's a really foolish decision, but it's a decision that you constitutionally have the right to make. So, can you raise your right hand? |
| [Climes:] | Yes, sir. |
| | (Defendant sworn.) |
| [Trial judge:] | All right. You've hired Ms. McCabe to represent you, right? |
| [Climes:] | Yes, sir. |
| [Trial judge:] | She's a good lawyer. She's smart and that's the reason you hired her. She tries lots of cases. She actually wins cases, too. And you want to not have |

|  |  |
|---|---|
| | her represent you in a trial and you want to represent yourself. Is that what you're telling me? |
| [Climes:] | Yes, sir. |
| [Trial judge:] | So, tell me all about your legal education and your legal background. |
| [Climes:] | I don't have any, sir. |
| [Trial judge:] | None. Zero. |
| [Climes:] | No, sir. |
| [Trial judge:] | No schooling? |
| [Climes:] | No, sir. |
| [Trial judge:] | No education? |
| [Climes:] | No, sir. |
| [Trial judge:] | No practical experience, other than the times you've been in a courtroom on your own case, right? |
| [Climes:] | Yes, sir. |
| [Trial judge:] | Never filed a motion. Never cross-examined a witness. Never picked a jury. Never argued in front of a judge, right? |
| [Climes:] | No, sir. |
| [Trial judge:] | So, what? You stayed at a Holiday Inn last night, though, or what? You know the commercial where they say, no, but I stayed at a Holiday Inn last night? |
| [Climes:] | No, sir. I would just like to, you know, just — |

23

[Trial judge:]    You got — if you got a tumor in your stomach, am I going to hand you a scalpel and are you going to start operating on yourself?

[Climes:]    I'm going to pray and ask God to handle the situation.

[Trial judge:]    Well, are you going to do the same thing now when you're representing yourself?

[Climes:]    I already did. Yes, sir.

[Trial judge:]    What does that have to do with legal representation, though? If you had a tumor in your stomach, you wouldn't take a scalpel and open yourself up, would you?

[Climes:]    I'm going to pray and ask God to lead me and guide me.

[Trial judge:]    Wouldn't you want the doctor to operate on you, if you were going to have an operation?

[Climes:]    If that's what God tell[s] me to do.

[Trial judge:]    So, you won't operate on yourself, but you're going to handle your own case where[ ] [you're] facing, what, a mandatory life sentence?

[Prosecutor:]    Yes, sir.

[Trial counsel:]    Yes.

[Trial judge:]    If you're convicted, I have — there's no choice. It's not like the judge can go, "No, wait a minute."

24

| | |
|---|---|
| [Climes:] | I understand. |
| [Trial judge:] | I have to give you life in prison. No parole. No nothing. Done. The end. |
| [Climes:] | I understand, sir. |
| [Trial judge:] | Do you understand that? |
| [Climes:] | Yes, sir. |
| [Trial judge:] | You've done none of this stuff before. You're facing life in prison. You got a trial set. You're going to have to pick a jury. You're going to have to cross-examine the witnesses.<br><br>You got two lawyers. Between them — what do you guys have? Fifty years of experience? How long? Thirty? |
| [Prosecutor #1:] | Thirty. |
| [Prosecutor #2:] | Fifteen. |
| [Trial judge:] | Forty-five years of experience. |
| [Climes:] | I understand, sir. |
| [Trial judge:] | You've got two lawyers against you. A total of forty-five years' experience, [they] have tried, together, hundreds of cases. You're going to be at a disadvantage. If you don't know what you're doing in a particular situation, I can't help you out and say, "Hey, this is the way that you do it," right? |
| [Climes:] | Yes, sir. |
| [Trial judge:] | Or I can't say, "Hey, the rules don't apply even if you don't know the rules." |

25

[Climes:]        If my lawyer's standby counsel, she will be able to do that [with] me, right?

[Trial judge:]   So, that's going to work well. While you're standing there trying to do it, she's going to be whispering in your ear how to do it, and that's going to come off — you're going to walk up there right in front of the jury after she whispers in your ear and that's going to come off smooth[ly] and really be good as far as the presentation's concerned. Is that right?

[Climes:]        I mean, sir — I mean, I'm just asking you, could I represent myself?

[Trial judge:]   Look, you can represent yourself.

[Climes:]        All right. Thank you.

[Trial judge:]   I'm trying — my job is to point out to you why that would be a terrible decision, but if you decide to do that, constitutionally, you have that absolute right.

[Climes:]        Thank you.

[Trial judge:]   I'm trying to give you a fair understanding of what it's going to be like, because I've had lots of people do it, most of them not so successfully.

[Climes:]        Yes, sir.

[Trial judge:]   And usually what happens is halfway through the trial, they go, "Oh, man, I can't do this. You take over." And then that puts your lawyer at a disadvantage because they haven't prepared. I mean, they do prepare but it's still not the

26

same thing because they would have done things differently.

[Climes:]    Yes, sir. I understand.

[Trial judge:]    You understand all of that, right?

[Climes:]    Yes, sir. And I appreciate your concern.

[Trial judge:]    Okay. Well, let's see. What have I — I've talked about what he's facing. I've talked about his experience. I've talked about what he doesn't know and what he needs to know.

[Prosecutor #1:]    Judge, I —

[Trial judge:]    You're not going to be able to — you can't say, "Hey, Kelly, get up there and cross-examine that witness."

[Climes:]    I understand.

[Trial judge:]    You're going to be doing it.

[Climes:]    Yes, sir.

[Trial judge:]    She can talk to you. She can give you advice. She can whisper in your ear, like I said, but she can't get up and do it for you. You're not co-counsel. Either she's the lawyer or you're the lawyer. You understand that?

[Climes:]    Yes, sir. Yes, sir.

[Trial judge:]    And if you're the lawyer, you're held to the standard of a lawyer.

[Climes:]    Yes, sir.

27

[Trial judge:] You don't know the rules of evidence. You don't know the rules of procedure. You can't say, "Hey Judge, help me out here," because I got to be fair to both sides. I'm just calling balls and strikes, right?

[Climes:] Yes, sir.

[Trial judge:] I'm just the umpire.

[Climes:] Yes, sir.

[Trial judge:] You understand all of that?

[Climes:] Yes, sir.

[Trial judge:] And you want to represent yourself?

[Climes:] Yes, sir.

[Trial judge:] What else?

[Prosecutor #1:] Judge, the court indicated that he had no schooling, but I believe he has gone to school. I just want to put on the record what the —

[Trial judge:] What's your highest level of education?

[Climes:] Tenth grade, sir. I got a GED.

[Trial judge:] You got a GED, but you've had no legal — formal legal training or any of that stuff, right?

[Climes:] No, sir.

[Trial judge:] No paralegal? No nothing?

[Climes:] No, sir.

28

| | |
|---|---|
| [Trial judge:] | Are you one of the guys over in the pods that's the jailhouse lawyer — |
| [Climes:] | No, sir. |
| [Trial judge:] | — or you don't even do that stuff? |
| [Climes:] | No, sir. |
| [Trial judge:] | So, you've done none of that? |
| [Climes:] | No, sir. |
| [Prosecutor #1:] | Judge, did he author — I just ask if he authored this motion to dismiss counsel. I know he signed it, but did he author that? |
| [Trial judge:] | Did you write this or did you have a little help over there from one of the legal eagles over in the jail? This motion you filed, did you sign — did you write it or did somebody else? |
| [Climes:] | I just signed it and filled in the blanks. |
| [Trial judge:] | You got to do more than fill in the blanks when you're on trial for the rest of your life. You understand that, right? |
| [Prosecutor #1:] | Judge, the motion — |
| [Trial judge:] | Well, let me get an answer to my question first. |
| [Climes:] | I'm sorry, sir? |
| [Trial judge:] | You've got to do more than fill in the blanks if you're on trial for the rest of your life. |

29

[Climes:]          Yes, sir. I understand, sir. I just wish to represent myself to — you know, that's my right, like you said. That's all.

[Trial judge:]     It is your right, and I'm comfortable that I've explained to you what all the potential pitfalls or problems are. You feel like you understand. It could be a problem for you, but this is what you want to —

[Climes:]          I'm totally — I'm totally aware of everything just explained to me.

[Trial judge:]     Okay.

[Climes:]          You already explained to me before. I mean, I [ ]weighed my options and, you know, I prayed on it, and this [is] the move I want to make.

[Trial judge:]     Okay. Scalpel, I suppose, right? Next, hand him the scalpel? All right. If that's your decision.

[Climes:]          Yes, sir.

[Trial judge:]     You know, I've tried to tell you why I think it's a bad decision. I've had lots of people do it. I don't know. I've tried to add it up. I think I'm somewhere between eight hundred and nine hundred trials in the last thirty years and I've probably had fifty of them represent themselves and maybe one successfully. I mean, maybe one.

                   And that was recently, and he turned over the second half of the trial to the lawyer who won it. So, it's an argument as to who actually got the acquittal in that case or not. Sorry, State. It's here on that one. All right.

30

He's decided he wants to represent himself, so we'll do that.

At the end of the hearing, the trial judge advised Climes that he could change his mind about his decision to represent himself at any time but warned him to not disadvantage standby counsel by changing his mind the morning of trial. (Doc. 15-2 at 27–28) At a pretrial hearing on September 24, 2014, after resolving some scheduling conflicts, the trial judge asked Climes whether he wanted to continue to represent himself, and he confirmed that he did. (Doc. 8-2 at 134–35)

A couple of months before trial, the trial judge appointed a doctor to evaluate Climes for competency. (Doc. 8-2 at 182) The doctor determined that Climes was competent to proceed to trial and that, under *Indiana v. Edwards*, 554 U.S. 164 (2008), Climes was competent to represent himself at trial. (Doc. 8-2 at 182–87) The trial judge adjudicated Climes competent to proceed. (Doc. 8-2 at 187)

The day of trial, the trial judge asked Climes whether he still wanted to represent himself at trial (Doc. 8-2 at 216), and Climes confirmed that he did. (Doc. 8-2 at 216) After Climes asserted that the Uniform Commercial Code required dismissal of the criminal case, the trial judge warned him against representing himself at trial and advised him to accept representation by an attorney. (Doc. 8-2 at 216–17)

After Climes argued that the trial judge lacked jurisdiction over the prosecution, Climes asked the trial judge to discharge standby counsel because of a conflict of interest. (Doc. 8-2 at 223–38) The trial judge denied the request and informed Climes that he would forfeit the right to represent himself at trial if he

31

continued to violate rules of procedure and frustrate the proceedings. (Doc. 8-2 at 223, 237–42) Climes requested a continuance to obtain new standby counsel. (Doc. 8-2 at 244–54) The trial judge denied the request for a continuance after determining that Climes intended to frustrate the proceedings. (Doc. 8-2 at 254) The trial judge informed Climes that he could change his mind about representing himself at any time. (Doc. 8-2 at 243–44)

A short time later, Climes asked the trial judge for standby counsel to represent him "for the moment." (Doc. 8-2 at 257–58) Standby counsel entered an appearance and moved for a continuance to permit Climes to hire new counsel. (Doc. 8-2 at 258–59) The trial judge denied the motion because the case was pending for 820 days, because Climes retained trial counsel, and because trial counsel needed to remain in case Climes forfeited his right to represent himself by continuing to violate the rules of procedure. (Doc. 8-2 at 259–60, 361–63) After denying the motion for a continuance, the trial judge granted Climes's request to resume self-representation. (Doc. 8-2 at 262–66)

During a recess from jury selection, Climes filed a handwritten motion advising that he did not understand both the accusations and the trial judge's jurisdiction. (Doc. 8-2 at 521) The trial judge acknowledged the motion and asked Climes whether he wanted standby counsel to represent him. (Doc. 8-2 at 521–22) Climes declined representation. (Doc. 8-2 at 522)

At the beginning of the second day of trial, the trial judge asked Climes whether he still wanted to represent himself. (Doc. 8-2 at 625) Climes advised that

he wanted to continue to represent himself and that he still was looking for an attorney to replace standby counsel. (Doc. 8-2 at 627–33)

After further discussion, Climes asked if standby counsel could resume representing him at trial because he did not understand the proceedings and because he felt that he could not receive a fair trial without representation. (Doc. 8-2 at 650–53) The trial judge warned Climes that he could not keep changing his mind about whether he wanted to represent himself. (Doc. 8-2 at 650–51)

Trial counsel gave an opening statement and cross-examined nine of the prosecutor's witnesses. After the prosecutor's ninth witness testified, Climes asked the trial judge to represent himself. (Doc. 8-2 at 1130) The trial judge denied the request without prejudice because Climes had changed his mind about self-representation several times, because the trial judge suspected Climes was engaging in gamesmanship, and because the trial judge and the prosecutor needed additional time to research the issue. (Doc. 8-2 at 1130–38) The trial judge suggested that Climes renew his request during the lunch break. (Doc. 8-2 at 1135–36)

During the lunch break, after the prosecutor's tenth witness testified, Climes renewed his request to represent himself. (Doc. 8-2 at 1197–98) The trial judge engaged in the following colloquy with Climes (Doc. 8-2 at 1217–28):

> [Trial judge:]    So what's going on here, Mr. Climes? What's the — you didn't know — you didn't seem to know what was going on yesterday. You didn't seem to know the day before what was going on.

33

We went back and forth about who was going to represent you, you or Ms. McCabe. What are we doing today?

[Climes:] For the record, I stated that I didn't understand the nature and the cause of the accusation. I did not state that I did not know what was going on between me and Ms. McCabe.

[Trial judge:] Well, how are you going to represent [yourself] if you don't understand the nature of the cause, the cause of the action?

[Climes:] I don't understand the nature and cause of the accusations, and I've been stating that I still don't. I'm here today still.

[Trial judge:] So how are you going to represent yourself if you don't even know what the nature and the cause of [the] accusations are?

[Climes:] I would like to represent myself, and I would like to [ ] exercise my constitutional rights to represent myself.

[Trial judge:] Your constitutional right as to what?

[Climes:] To represent myself.

[Trial judge:] As to what? What are we doing today? What are — what have we been doing the last three days?

[Climes:] What do you mean by that?

[Trial judge:] What have we been doing? You don't understand the nature and cause of the accusations. What court are we in?

34

| [Climes:] | I don't understand what jurisdiction this court is operating under, if that's what you want. |
|---|---|
| [Trial judge:] | So what court are you in right now? |
| [Climes:] | I'm in Judge Phillip Federico's court. |
| [Trial judge:] | And that's a court of what? Is that an admiralty court, is it a civil court, is it a criminal court, what is it? |
| [Climes:] | I asked you that question a million times, Your Honor. You haven't answered my question. |
| [Trial judge:] | If you don't even know what kind of courtroom you're in, how am I supposed to find you're alert, intelligent, and capable of representing yourself? |
| [Climes:] | Do you want me to ask you, so you can tell me, and I can move forward? |
| [Trial judge:] | No. I want you to tell me what court we're in. |
| [Climes:] | Your Honor, you haven't [given] me that. I asked you on numerous occasions. |
| [Trial judge:] | So, you don't [know] what court you're in? |
| [Climes:] | We're in Judge Phillip Federico's court. |
| [Trial judge:] | Okay. And that is what type of court? |
| [Climes:] | What do you mean by that? |

35

| | |
|---|---|
| [Trial judge:] | What kind of court is it? Is this a UCC contract dispute? Is this an admiralty court? Is this a criminal court? What is it? Pick one. |
| [Climes:] | I've got three — in this constitution, it's a common law court, it's an equity of law court, it's an admiralty of law court. |
| [Trial judge:] | Okay. So you don't even know what courtroom we're in, right? |
| [Climes:] | No. I'm not saying that. I said, Your Honor — |
| [Trial judge:] | Are you charged with a crime or are you charged with a contractual violation? What are you charged with in this case? |
| [Climes:] | I'm charged with a crime. |
| [Trial judge:] | Okay. So, you're in criminal court then, right? |
| [Climes:] | If that's what this is, right. If that's what you say, right. I guess so. |
| [Trial judge:] | You can't make the leap? I'm charged with a crime, so I might be in criminal court? You can't figure that out, yet you want to represent yourself? |
| [Climes:] | Your Honor, I don't want to argue back and forth. |
| [Trial judge:] | No. I have to find — part of *Faretta* is that I find you're alert, intelligent, and are capable of understanding your surroundings and handling the case appropriately in the courtroom. |

36

|  | If you don't know what kind of courtroom you're in, or what kind of action we're having, I don't know how I can say you're alert and intelligent and capable of even beginning to represent yourself. |
|---|---|
| [Climes:] | Your Honor, you have let me represent myself before. I would like to represent myself. I would like to exercise my constitutional right to represent myself. |
| [Trial judge:] | We had different discussions the last *Faretta* hearings that we had. So, a witness is going to testify and then what's going to happen after the State asks the witness questions? |
|  | After the State gets done questioning their — questioning their witness, what's going to happen, if you represent yourself? |
| [Climes:] | I would then ask — Mr. O'Haire would then step up and ask the witnesses. |
| [Trial judge:] | And then? |
| [Climes:] | And then me. |
| [Trial judge:] | And you would follow what rules in doing that? |
| [Climes:] | What do you mean? I ask questions, courtroom rules, I guess. What you mean? Regular questions, like everybody else has been asking. |
| [Trial judge:] | Courtroom rules that are — courtroom rules are based on what? |
| [Climes:] | I'm sure I'm capable of asking just questions as everybody else is asking. |

37

[Trial judge:]      You're held to the same standard as an attorney in this case. I've told you that before. We've discussed that. You've told me you don't know what the rules of evidence are. You've told me you don't know what the rules of criminal procedure are. You told me you didn't even know this was a criminal case, because you thought it might be an admiralty or a UCC case, until we just had this question now. But you're going to be able to follow those rules, right?

[Climes:]      For the record, Your Honor, I didn't tell you what kind of court this was. I asked you what kind of court this was.

[Trial judge:]      If you're convicted of the main charges, you're facing a mandatory life sentence, you understand that, right?

[Climes:]      I understand, Your Honor.

[Trial judge:]      Do you understand that?

[Climes:]      Yeah.

[Trial judge:]      Okay.

[Climes:]      I'm going to get a life sentence if I get convicted guilty.

[Trial judge:]      Of the main charges, correct.

[Climes:]      Okay.

[Trial judge:]      You understand that the jury's not supposed to hear that — despite your co-defendant blurting that out; a jury's not supposed to know what the

38

|                 | possible penalties in the case are, do you understand that? |
|-----------------|-----------------|
| [Climes:]       | Yeah, now I understand that. |
| [Trial judge:]  | You didn't understand that before? |
| [Climes:]       | I just saw what happened. Of course, I understand it. |
| [Trial judge:]  | But you didn't know that from your research in preparing the case? |
| [Climes:]       | I didn't think about coming to do that, so I wouldn't — I didn't think of nothing like that. So, it was not to my attention to know that. |
| [Trial judge:]  | Did you write down questions that you want to ask these witnesses? |
| [Climes:]       | Yeah. And I have the witness statements and the depositions. |
| [Trial judge:]  | That's fine. I'll give you another shot at it. I'll tell the jury that's — this is way against my better judgment. |
|                 | The State expressing their concern about it gives me some pause under the circumstances. We went from self-representation to Ms. McCabe for thirty seconds, back to self-representation, back to Ms. McCabe yesterday, and now back to self-representation again. |
|                 | I don't doubt that he understands what goes on [in] a courtroom. I think this part of the charade we've been playing as far as the — what are we going to — what do we want to call it? How would |

39

we characterize this whole strawman thing we've been going through?

[Prosecutor:]    I don't know. I don't know how to characterize this.

[Trial judge:]    What do we call the general thing we've been calling —

[Prosecutor:]    Sovereign citizen.

[Trial judge:]    — sovereign citizen thing?

[Prosecutor:]    Right.

[Trial judge:]    I don't think he's — he doesn't understand where we are or what the jurisdiction or who's being accused. I think that's just a ruse for this whole sovereign citizen thing, which really never started in state court.

That's the ironic thing. It started in federal court for state court people saying, defense [doesn't] have jurisdiction on us, right? Somehow that's morphed into a state court argument and in a state situation, which is totally against how it started out in those western states, but be that as it may, somehow he's got it in his head that this sovereign citizen thing applies.

So to say that he doesn't understand or that his answers, I should accept them at face value, really goes against everything that I've seen and sat through for the last three days and everything that I've seen in the months leading up to this.

40

|  |  |
|---|---|
|  | So to use that as a reason to say, no, you can't, I would be disingenuous and dishonest with myself to use that. And so, just because of that, I'm going to allow him. |
|  | If you don't follow the rules, if I tell you, you can't ask a question or you can't argue something and you don't listen, as Mr. Stewart didn't listen, then I'm going to take the right to self-representation away. |
| [Climes:] | Yes, sir. |
| [Trial judge:] | Your right to self-representation is not eternal. It doesn't keep going and going and going. |
| [Climes:] | That's fine. |
| [Trial judge:] | If you fail to follow the rules, and we've gone back and forth — you know, this is the fifth time in the last three days we've switched, then I'm going to take it away. |
|  | But if you follow the directives of the court and you ask appropriate questions, then I'll allow you to exercise your right to — renew your right to self-representation, at this point. Okay? |
| [Climes:] | Yes, sir. Can I state — |
| [Prosecutor:] | Ms. McCabe — |
| [Trial judge:] | She's going to remain as standby counsel, yes. |
| [Climes:] | I want to make a record for the court. Like you said, whatever [ ] strawman |

41

> or whatever, I'm here to represent myself as a human being, not a fictitious entity.
>
> [Trial judge:]        Sui juris, right?
>
> [Climes:]              I'm representing me, Maurice Climes, a human, living soul. . . .

Climes cross-examined seven of the prosecutor's witnesses. (Doc. 8-2 at 1236–61, 1282–89, 1307–12, 1336–39, 1363–71, 1406–10, 1421–22) After Climes finished cross-examining one of the witnesses, the trial judge asked Climes if he was "still sure about this," and Climes responded, "I'm positive, sir." (Doc. 8-2 at 1292)

At the end of the third day of trial, the trial judge permitted Climes to speak with his mother and his fiancé about continuing self-representation. (Doc. 8-2 at 1426–28, 1431) The next day, in the morning, Climes advised the trial judge that he intended to continue to represent himself. (Doc. 8-2 at 1437) Climes cross-examined four more of the prosecutor's witnesses. (Doc. 8-2 at 1444–47, 1456–58, 1471–72, 1519–25) Also, Climes moved for a judgment of acquittal (Doc. 8-2 at 1531–32), presented testimony by one witness (Doc. 8-2 at 1583–89), and argued during closing. (Doc. 8-2 at 1720–52)

"*Faretta* provides that when a defendant requests to discharge counsel and to proceed *pro se*, a trial court should conduct an inquiry and make the defendant 'aware of the dangers and disadvantages of self-representation, so that the record . . . establish[es] that [the defendant] knows what he is doing and his choice is made with eyes open.'" *Tuomi v. Sec'y, Fla. Dep't Corrs.*, 980 F.3d 787, 798 (11th Cir. 2020)

(quoting *Faretta*, 422 U.S. at 835). "'The ideal method of assuring a voluntary waiver is for the trial judge to conduct a pre-trial hearing at which the defendant would be informed of the charges, basic trial procedures, and the hazards of self-representation.'" *Tuomi*, 980 F.3d at 798 (quoting *United States v. Stanley*, 739 F.3d 633, 645 (11th Cir. 2014)). "'If the trial record shows that a defendant knowingly and voluntarily elected to represent himself, the *Faretta* standard will be satisfied.'" *Tuomi*, 980 F.3d at 798.

The record overwhelmingly demonstrates that the trial judge complied with the requirements of *Faretta*. On June 2, 2014, at a pretrial hearing about nine months before trial, Climes asked for the first time to represent himself. (Doc. 8-2 at 91) The trial judge conducted a thorough colloquy with Climes about his lack of education, his lack of legal training, the prosecutor's extensive legal experience, trial counsel's extensive legal experience, the mandatory life sentence that he faced at trial, and the complicated rules that govern a trial. (Doc. 8-2 at 92–99) After the trial judge finished with the colloquy, Climes declined to represent himself and advised the trial judge that he may want to represent himself in the future. (Doc. 8-2 at 98–99)

On August 15, 2014, at a pretrial hearing about seven months before trial, Climes moved to discharge his retained counsel and asked to represent himself. (Doc. 15-2 at 5) The trial judge conducted a second thorough colloquy with Climes about his lack of education, his lack of legal training, the prosecutor's extensive legal experience, trial counsel's extensive legal experience, the importance of representation by a trained lawyer, the mandatory life sentence that he faced at trial,

43

and the complicated rules that govern jury selection, cross-examination, and the admission of evidence. (Doc. 15-2 at 9–28) After Climes acknowledged that he understood the dangers and disadvantages of self-representation, the trial judge allowed Climes to represent himself. (Doc. 15-2 at 28) The trial judge reminded Climes that he could change his mind about his decision to represent himself at any time. (Doc. 15-2 at 27–28)

Consequently, the trial judge complied with *Faretta* by conducting both the colloquy on June 2, 2014, and the second colloquy on August 15, 2014, to ensure that Climes knowingly and voluntarily waived his right to counsel. *Faretta*, 422 U.S. at 835 ("Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'") (citation omitted).

Climes asserts that the trial judge violated *Faretta* by failing to conduct a hearing during every subsequent critical stage in the case. (Doc. 1 at 5) He contends that the trial judge should have held an additional hearing during trial. (Doc. 1 at 5) On September 24, 2014, at a pretrial hearing about five months before trial, the trial judge asked Climes if he still wanted to represent himself, and Climes confirmed that he did. (Doc. 8-2 at 134–35) At the beginning of trial, the trial judge asked Climes again whether he wanted to represent himself, and Climes confirmed that he did. (Doc. 8-2 at 216) After Climes filed a frivolous motion to dismiss the criminal case

44

under the Uniform Commercial Code, the trial judge warned Climes that he should accept representation by standby counsel because Climes will not know how to pick a jury. (Doc. 8-2 at 216–17) During a recess from jury selection, the trial judge again asked Climes if he wanted standby counsel to represent him, and Climes declined representation. (Doc. 8-2 at 521–22) The trial judge's failure to conduct an additional colloquy with Climes at the beginning of trial and to instead repeatedly confirm that Climes did not want the assistance of counsel did not violate clearly established law by the U.S. Supreme Court. *See* 28 U.S.C. § 2254(d)(1). *McClain v. Sec'y, Dep't Corrs.*, 855 F. App'x 610, 613–14 (11th Cir. 2021)[2] ("There is no clearly established Supreme Court law on when the Sixth Amendment requires an additional waiver of counsel, just that there are times when it may be necessary. *Patterson* only speaks to the type of waiver necessary depending on the stage, but it does not clearly hold there needs to be a new waiver at each stage.") (citing *Patterson v. Illinois*, 487 U.S. 285, 298–99 (1988)).

Lastly, the trial judge scrupulously honored Climes's right to self-representation by permitting standby counsel to enter an appearance "for a moment," (Doc. 8-2 at 257–59), by permitting Climes to resume self-representation after that short appearance (Doc. 8-2 at 262–66), by permitting standby counsel to enter a second appearance to cross-examine the majority of the prosecutor's witnesses, and by permitting Climes a second time to resume self-representation for

---

[2] 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

the remainder of the trial. In the middle of trial, when Climes wanted to resume self-representation, the trial judge complied with *Faretta* by conducting a third colloquy, by ensuring that Climes understood the nature of the proceedings and knew how to cross-examine witnesses, and by reminding Climes that he faced a mandatory life sentence at trial. (Doc. 8-2 at 1217–28)

Climes's "'invitation to counsel to participate in the trial obliterates any claim that the participation in question deprived the defendant of control over his own defense,'" and "'[s]uch participation also diminishes any general claim that counsel unreasonably interfered with the defendant's right to appear in the status of one defending himself.'" *Gill v. Mecusker*, 633 F.3d 1272, 1294 (11th Cir. 2011) (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 182–83 (1984)).

Several times, Climes moved for permission to act as co-counsel with his retained attorney, and the trial judge denied his request for hybrid representation. (Docs. 8-2 at 91–92, 97 and 15-2 at 6–7) *Faretta* does not require a trial judge to permit hybrid representation. *McKaskle*, 465 U.S. at 183 ("*Faretta* does not require a trial judge to permit 'hybrid' representation of the type Wiggins was actually allowed . . . . A defendant does not have a constitutional right to choreograph special appearances by counsel.").

Also, on the morning of the first day of trial, Climes moved to discharge standby counsel because of a conflict of interest[3] and moved for a continuance to

---

[3] Climes contended that standby counsel could not represent him because she represented a defendant charged with the murder of Anthony Brinson. (Doc. 8-2 at

46

obtain new standby counsel. (Doc. 8-2 at 223) Climes asserted that he was entitled to discharge standby counsel because of the conflict and because he retained standby counsel. (Doc. 8-2 at 224–28)

The trial judge denied Climes's motion to discharge standby counsel because no conflict existed, because Climes did not retain another attorney to replace standby counsel, because Climes waited until the morning of trial to request new standby counsel, because Climes intended to frustrate the proceedings, and because Climes would suffer prejudice if he did not have the assistance of standby counsel. (Doc. 8-2 at 237–44) Despite Climes's requests to discharge standby counsel, he subsequently requested that she represent him twice during trial. (Doc. 8-2 at 257–58, 650–53)

Climes's subsequent requests for standby counsel to represent him substantially undermine any claim that standby counsel interfered in his self-representation. *McKaskle*, 465 U.S. at 182 ("A defendant like Wiggins, who vehemently objects at the beginning of trial to standby counsel's very presence in the

---

224) At trial, Climes intended to argue that Brinson committed the crimes charged in his case because police discovered Brinson's DNA on a hat at a crime scene. (Doc. 8-2 at 224) Standby counsel acknowledged that Brinson's murder was not connected to the crimes charged in Climes's case. (Doc. 8-2 at 225) The trial judge sufficiently investigated the conflict and did not unreasonably determine that no actual conflict of interest existed. (Doc. 8-2 at 225–26) *Dallas v. Warden*, 964 F.3d 1285, 1303–04 (11th Cir. 2020) ("[U]nder *Sullivan*, where a trial court fails to adequately investigate any other type of conflict [besides the joint representation of co-defendants] that it knows or reasonably should know about, reversal is only warranted if the petitioner shows an actual conflict that negatively affected his attorney's performance.") (citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980)).

47

courtroom, may express quite different views as the trial progresses. Even when he insists that he is not waiving his *Faretta* rights, a *pro se* defendant's solicitation of or acquiescence in certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably.").

Because the trial judge conducted three colloquies with Climes to ensure that he knowingly and intelligently waived his right to counsel and because the trial judge repeatedly reminded Climes about his right to counsel, Climes fails to demonstrate that the state court unreasonably applied *Faretta*. Consequently, the state appellate court did not unreasonably deny a *Faretta* claim. *Moody v. Comm'r, Ala. Dep't Corrs.*, 682 F. App'x 802, 810 (11th Cir. 2017)[4] ("There is no categorical bar on the assistance of standby counsel for a defendant who has elected to represent himself at trial. Indeed, where it is necessary, a trial court may appoint standby counsel over the objection of a defendant who has chosen not to have the assistance of an attorney.") (citing *Wiggins*, 465 U.S. at 182).

Ground One is **DENIED**.

**Ground Two**

In Ground Two, Climes asserts seven ineffective assistance of counsel claims. (Doc. 1 at 8) He asserts that trial counsel deficiently performed by conceding in opening statements that he committed grand theft of a motor vehicle and fleeing and eluding a law enforcement officer. (Doc. 1 at 8) ("Sub-claim A") He asserts that trial

---

[4] 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

counsel deficiently performed by failing to move to suppress his statements to a police officer during his arrest. (Doc. 1 at 8) ("Sub-claim B") He asserts that trial counsel deficiently performed by failing to move to suppress testimony by the victims identifying Climes as the perpetrator of the crimes. (Doc. 1 at 8) ("Sub-claim C") He asserts that trial counsel deficiently performed by failing to move for a statement of particulars on the charge for fleeing and eluding a law enforcement officer. (Doc. 1 at 8) ("Sub-claim D") He asserts that trial counsel deficiently performed by failing to introduce exculpatory evidence during the cross-examination of the prosecutor's witnesses. (Doc. 1 at 8) ("Sub-claim E") He asserts that trial counsel deficiently performed by failing to object to the prosecutor's opening statement and to police officers' testimony that supported the conviction for fleeing and eluding a law enforcement officer. (Doc. 1 at 8) ("Sub-claim G") He asserts that cumulative error arose from trial counsel's deficient performance. (Doc. 1 at 8) ("Sub-claim F")

**Sub-claim A**

Climes asserts that trial counsel deficiently performed by conceding in opening statements that Climes committed grand theft of a motor vehicle and fleeing and eluding a law enforcement officer. (Doc. 1 at 8)

The post-conviction court denied the claim as follows (Doc. 8-2 at 2388–89) (state court record citations omitted):

> The Defendant alleges that counsel was ineffective for admitting his guilt to the charges of fleeing to elude and grand theft [of a] motor vehicle by referring to him as the driver of the stolen vehicle during her opening statement. The Defendant states [that] counsel did not have his

49

permission to admit guilt to these charges. The Defendant argues that he need not allege prejudice under *Strickland* because he believes he has stated a facially sufficient claim [and] that because counsel's concessions amounted to *per se* ineffective assistance of counsel, the test set forth in *United States v. Cronic*, 466 U.S. 648 (1984), applies. However, "in order to obtain relief based on ineffective assistance of counsel for conceding guilt without the defendant's consent, the defendant must demonstrate that counsel's performance was deficient and that the defendant was prejudiced by the deficient performance as required under *Strickland* . . . ." *Nixon v. State*, 932 So. 2d 1009, 1017 (Fla. 2006). Because the Defendant has failed to allege prejudice, his claim is facially insufficient. [The claim] is therefore stricken. If the deficient claim can be remedied by a good faith amendment, the Defendant shall have only sixty days to file an amended petition with sufficient detail to cure the pleading defect. Failure to file an amended pleading within sixty days will result in this ground being denied with prejudice. *See Jimenez v. State*, 993 So. 2d 553, 556 (Fla. 2d DCA 2008); *Spera v. State*, 971 So. 2d 754, 760 (Fla. 2007). Fla. R. Crim. P. 3.850(f)(3).

The post-conviction court denied an amended claim as follows (Doc. 8-2 at 2436–37) (state court record citations omitted):

Defendant alleges that counsel was ineffective for admitting his guilt to the charges of fleeing to elude and grand theft [of a] motor vehicle by referring to him as the driver of the stolen vehicle during her opening statement. Defendant states that counsel did not have his permission to admit guilt to these charges. Defendant argues that he need not allege prejudice under *Strickland* because he believes he has stated a facially sufficient claim [and] that because counsel's concessions amounted to *per se* ineffective assistance of counsel, the test set forth in *United States v. Cronic*, 466 U.S. 648 (1984), applies. However, as the Court previously noted, "in order to obtain relief based on ineffective assistance of counsel for conceding guilt without the defendant's consent, the defendant must demonstrate that counsel's performance was deficient and that the defendant was prejudiced by the deficient

50

performance as required under *Strickland* . . . ." *Nixon v. State*, 932 So. 2d 1009, 1017 (Fla. 2006).

After reviewing Defendant's amended motion, the court finds his claim remains facially insufficient. Defendant has failed to adequately allege prejudice as required by *Strickland*. Accordingly, the court finds that [the claim] must be denied.

In his amended motion, Climes persisted in his contention that the prejudice standard under *United States v. Cronic*, 466 U.S. 648 (1984), applied to his ineffective assistance of counsel claim. (Doc. 8-2 at 2404–09)

However, the post-conviction court overlooked that Climes asserted, in the alternative, prejudice under *Strickland* (Doc. 8-2 at 2409–11) (state court record citations omitted):

The Defendant has shown that this claim should be reviewed under the *Cronic* standard. Defendant will also show where he was prejudiced by counsel's deficient performance[,] [a]ccording to *Strickland*.

Counsel was deficient where the evidence that the Defendant was the driver was circumstantial and was subject to challenge, all officers testified that they never [saw] the driver of the Charger, [and] counsel's deficient performance prejudiced the Defendant and deprived him the right to a fair trial, the right to be presumed innocent until proven guilty, and the right that the State prove a criminal matter beyond a reasonable doubt.

This case is not one in which the surrounding circumstances make it unlikely that the Defendant could have received effective assistance of counsel. Counsel's admissions [were] not to a lesser included. The Defendant was clearly prejudiced where the jury [ ] didn't need to go past counsel's opening statement to convict him guilty for fleeing to elude. Defendant argues counsel's admissions also persuaded the jury's verdict on the Defendant being a

51

> principal to armed burglary. The Defendant has shown that his trial attorney did not act reasonable in representing the Defendant and absent counsel's ineffective representation, there is a reasonable probability the results of the proceeding would have been different had counsel not admitted. Further, as stated above, counsel's admissions [were] a slip of the tongue mistake, [and] counsel's admissions were unintentional and not a matter of trial strategy. Prior to trial, the State Attorney explained to the court that, if there was going to be a plea deal in this case, it would be around twenty-five to thirty years and defense counsel explained that the Defendant Climes was not even willing to offer or take fifteen years. It is unreasonable for counsel to admit to one charge and get the Defendant thirty years when the Defendant wasn't willing to take twenty-five to thirty years for all six charges. Counsel's admission clearly prejudiced the Defendant.

Because the post-conviction court unreasonably determined that Climes failed to allege prejudice under *Strickland* in his amended motion, the Court reviews the claim *de novo*. 28 U.S.C. § 2254(d)(2). *King v. Warden, Ga. Diag. Prison*, 69 F.4th 856, 867 (11th Cir. 2023) ("If a state court unreasonably applied federal law or unreasonably determined the facts in a case, we review the underlying claim *de novo*.").

During opening statements, trial counsel told the jury that the evidence would show that Climes was merely present when Stewart and Brinson committed the crimes (Doc. 8-2 at 688–91):

> [Trial counsel:]   You're going to hear that on December 9, 2012, my client was called, or text[ed], by his friend, Arsenio Brison.
>
> There is a third person. There's absolutely a third person. And his name is Arsenio Brinson. And Arsenio Brinson goes by the nickname of Boo.

52

You're going to hear that my client knew Boo, and he knew him well. He didn't know Mr. Stewart very well. Mr. Stewart knew Boo.

You're going to hear that Boo text[ed] my client and said, "Hey," you know, "Come pick me up at my friend's house." And you're going to hear he was told to wait out in the alleyway, they would be out in a minute. He had no idea who was in the house. He had no idea what was going on in that house.

You're going to hear that out came Boo with Mr. Stewart and Boo's carrying a bag full of guns. My client didn't know that there were guns in the bag. We learned that later as evidence came out in this case.

He's carrying a duffel bag, jumps in the car, and says, "Go, go, go." My client has no idea what's going on. Has no clue what just took place in that house.

You're going to hear from the evidence though that Mrs. Angella Jackson left that front door unlocked at 1:00 something in the morning. You're going to hear, I'm sure it's going to come out, that it's probably some sort of drug deal gone bad in that first house.

You're going to hear that my client's told to "Go, go, go." He's scared. He has no idea what's going on. His friend just jumps in the car.

Mr. Stewart, who he did know as an acquaintance, jumps in the car and

53

Boo's yelling to, "Go, go, go." All of a sudden, the police are following him. He has no idea what's going on.

You heard from the State that the tire blows out. They go into a driveway. And you're going to hear the three of them get out. You're going to hear that one of the officers sees the driver, who is my client, trailing behind the other two.

You're going to hear that two people went into that second house. But members of the jury, pay very close attention to the details in this case, because you're going to hear that the DNA that, there [were] hand swabs taken from Mr. Jeremy Reed.

Because remember, what happened? He grabbed that person who first walked in, correct? And you're going to hear that my client's DNA is not on those hand swabs, nor is my client's DNA on the scene swabs that were taken from that second house.

You're going to hear that when they were driving to this second house, or the neighborhood of this second house, that my client thought they were going to Boo's aunt's house.

That Boo had an aunt that lived in that neighborhood and my client had been there a week or so before that. He had no idea that the house that Boo went into, who you're going to see looks very similar to my client, all the way down to their height, their size, their teeth, their haircut, everything.

54

You're going to hear he had no idea that wasn't Boo's aunt's house. That he came out and threw a pair of keys to my client, to the car that's in the driveway.

Members of the jury, you need to pay close attention to the details in this case. The State is going to bring up evidence that has nothing to do with this case.

The mask, none of the victims are told — will tell you that there was a mask worn. None of the victims in this case are going to tell you that there was a crowbar used.

Items that are found in the car. The Spiderman mask, it's a kid's mask. You'll hear that my client has five kids.

Pay attention to the details in this case. These high-speed chases that they supposedly went on, you have tons of police vehicles involved, yet not one of them had any sort of video of this driving that's allegedly occurred.

I'm confident, once you hear all of the testimony in this case, and you see all the evidence in this case, that you will be able to find my client not guilty. Thank you.

After opening statements, the prosecutor asked the trial judge to confirm with trial counsel whether she strategically conceded that Climes committed fleeing and eluding a law enforcement officer (Doc. 8-2 at 692–94):

> [Trial judge:]    I don't normally have clients at conferences.

55

[Trial counsel:]    He wants to be present.

[Prosecutor:]    Well, in the opening, Judge, it seems to me like she just conceded the fleeing and eluding. And I think we just need to get that strategy on the record from counsel.

[Trial judge:]    I would agree with you, except she said there's no video, so maybe she's suggesting that since there's no video, there's a reasonable doubt.

[Prosecutor:]    Well, she put her client in the car. She said the cops were behind them. She said they blew the tire and then he left, you know.

[Trial counsel:]    So, that's great. Are you going to concede, then that way you don't have to introduce any of that evidence in the car?

[Prosecutor:]    No. My point is —

[Trial judge:]    Unless you're officially conceding it. You're also kind [of] conceding — it's close to conceding the grand theft auto too, if he tosses him keys.

[Trial counsel:]    But he has no idea who car — that it's not the aunt's car.

[Trial judge:]    That's the point. Huh?

[Trial counsel:]    That it's not the aunt's car.

[Trial judge:]    Knew or should have known. Somebody tosses you keys at 1:30 in the morning and you just hop in the car and take running —

56

| | |
|---|---|
| [Prosecutor:] | After the cops have been following you, and [you] run. |
| [Trial counsel:] | And he thinks he's going to his aunt's house. |
| [Prosecutor:] | And that's fine about the grand theft auto, but — |
| [Trial judge:] | If he — if he — your position is you're not conceding it, right? |
| [Prosecutor:] | Okay. |
| [Trial counsel:] | I'd have to have further discussion with my client. |
| [Trial judge:] | All right. I don't know that it gets to the point that it's a concession because she said there [were] no videos. |
| [Prosecutor:] | All right. |
| [Trial judge:] | So, I think she's still holding onto a reasonable doubt argument. I don't think she conceded — she conceded some of his actions, but I don't know that [ ] those actions rose to the level of a crime at this point. So, based on that, depending on how it develops, we may have to have that conversation at some point. |
| [Prosecutor:] | Fair enough. |

To succeed on a claim that trial counsel deficiently performed by conceding guilt, a petitioner must demonstrate that a concession exists and that the concession

is unreasonable under *Strickland*. *Florida v. Nixon*, 543 U.S. 175, 189 (2004); *Darden v. United States*, 708 F.3d 1225, 1232 (11th Cir. 2013).

In *Nixon*, "[t]he Supreme Court explained [ ] that *Cronic*'s presumption was a 'narrow exception' to *Strickland*'s prejudice requirement where 'counsel has entirely failed to function as the client's advocate.'" *Harvey*, 629 F.3d at 1251 (citing *Nixon*, 543 U.S. at 189–90). The Supreme Court concluded that "[t]he concession strategy in *Nixon* did not fall into that category, as trial counsel viewed concession to be the only way to save Nixon's life in the face of the prosecution's overwhelming evidence." *Harvey*, 629 F.3d at 1251 (citing *Nixon*, 543 U.S. at 191–92).

"*Cronic*'s presumed prejudice standard is only available in extreme circumstances where 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.'" *Harvey*, 629 F.3d at 1251 (quoting *Chronic*, 466 U.S. at 659). "The 'failure must be complete . . . . [C]ounsel [must] fail[ ] to oppose the prosecution throughout the . . . proceeding as a whole,' rather than merely 'at specific points' in the proceeding." *Harvey*, 629 F.3d at 1251 (quoting *Bell*, 535 U.S. at 697). *Darden*, 708 F.3d at 1232 ("The Court has never retreated from its holding in *Cronic* that only where defense counsel 'entirely fails to subject the prosecution's case to meaningful adversarial testing,' should prejudice be presumed.").

*McCoy v. Louisiana*, 584 U.S. 414, 427 (2018), held that "counsel's admission of a client's guilt over the client's express objection is error structural in kind" and that "such an error is not subject to harmless-error review." In *McCoy*, 584 U.S. at

417, "the defendant vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." The defendant "opposed [trial counsel's] assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court." *McCoy*, 584 U.S. at 424.

The structural error rule in *McCoy* does not apply to Climes's claim because *McCoy* arose from a challenge to a capital conviction on direct appeal, and Climes challenges non-capital convictions on federal habeas. *McCoy*, 584 U.S. at 420. "The Supreme Court emphasized in [*Brecht v. Abrahamson*, 507 U.S. 619, 633–34 (1993),] that 'collateral review is different from direct review,' and, therefore, that 'an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.'" *Mansfield v. Sec'y, Dep't Corrs.*, 679 F.3d 1301, 1307 (11th Cir. 2012).

Also, unlike the defendant in *McCoy*, Climes did not allege in his motion for post-conviction relief that he opposed any suggestion by trial counsel that she concede guilt to a charged crime. (Doc. 8-2 at 2404–41) The trial transcript demonstrates that, Climes, who otherwise very actively participated during trial, did not object to trial counsel's alleged concession during the opening statement. (Doc. 8-2 at 688–92) During the sidebar conference after opening statements, the prosecutor argued that trial counsel conceded guilt during her opening statement. (Doc. 8-2 at 692–94) Climes, who attended the sidebar conference, did not object when he heard the prosecutor's argument about the concession. (Doc. 8-2 at 692–94)

Because Climes waited until after trial to complain about the alleged concession, the structural error rule in *McCoy* does not apply. *McCoy*, 584 U.S. at 424.

Lastly, because Climes failed to demonstrate that "'counsel entirely failed to function as [his] advocate,'" and because Climes represented himself during a significant part of the trial, the presumed prejudice standard in *Chronic* does not apply. *Harvey*, 629 F.3d at 1251 (quoting *Chronic*, 466 U.S. at 659). Consequently, this Court will evaluate Climes's claim under *Strickland*. *Darden*, 708 F.3d at 1233 (citing *United States v. Thomas*, 417 F.3d 1053 (9th Cir. 2005)).

Under Florida law, "[s]pecific intent is an essential element of the crime of theft." *Johnson v. State*, 228 So. 3d 1164, 1167 (Fla. 1st DCA 2017). "'Where it clearly appears that the taking of property was consistent with honest conduct, as where the taker honestly believes that he or she has a right to property, the taker cannot be convicted of theft, even though the taker may have been mistaken.'" *Johnson*, 228 So. 3d at 1167 (citation omitted). The information charged Climes with committing grand theft of an automobile. (Doc. 8-2 at 15) During opening statements, trial counsel told the jury that Climes thought that he drove Brinson and Stewart to a home that belonged to Brinson's aunt. (Doc. 8-2 at 690) Trial counsel stated that only Brinson and Stewart went inside the home and that shortly after the two exited the home, Brinson threw to Climes keys that belonged to a car parked in the driveway. (Doc. 8-2 at 690–91) Because a jury could infer from these statements that Climes mistakenly believed that the car parked in the driveway belonged to Brinson's aunt, trial counsel did not concede that Climes committed grand theft.

The information charged Climes with fleeing and eluding a law enforcement officer at a high rate of speed or in a manner that demonstrated wanton disregard for the safety of persons or property. (Doc. 8-2 at 15) A defendant must willfully flee from the law enforcement officer. *Matheny v. State*, 15 So. 3d 658, 660 (Fla. 1st DCA 2009). Also, "'[w]anton disregard is a conscious and intentional indifference to consequences and with knowledge that damage is likely to be done to persons or property.'" *Canidate v. State*, 238 So. 3d 412, 414 (Fla. 4th DCA 2018) (citation omitted).

Trial counsel stated that Brinson told Climes to pick him up at his friend's house and that Climes did not know what occurred in the house. (Doc. 8-2 at 688) Trial counsel further stated that Brinson and Stewart entered Climes's car with a duffel bag, that Climes did not know that the duffel bag contained guns, and that Brinson told Climes to, "Go, go, go." (Doc. 8-2 at 688–89) Trial counsel described Climes as scared, stated that Climes did not know "what's going on," and stated that "all of a sudden the police [were] following him." (Doc. 8-2 at 689) Trial counsel denied that the prosecutor would present evidence to prove that a high-speed chase occurred. (Doc. 8-2 at 691)

Because a jury could infer from these statements that Climes did not willfully flee from a law enforcement officer and did not act indifferently with knowledge that damage to persons or property was likely to occur, the record refutes that trial counsel deficiently performed.

61

Moreover, contrary to Climes's suggestion that all officers testified that they never saw the driver of the Charger, the evidence shows that officers did identify him as the driver. A police officer testified that he followed the stolen Mazda at a high rate of speed and observed the driver exit the Mazda. (Doc. 8-2 at 1070–71) Another officer prevented the driver from stealing another car, took the driver into custody, and identified Climes as the driver. (Doc. 8-2 at 888–90, 975–79, 1070–71, 1355)

Finally, Climes all but confessed to the crime when he was arrested. He certainly admitted to driving his Charger and fleeing from the officers. One of the officers testified that he asked Climes his name, and Climes responded, "Y'all motherfuckers wouldn't have got me if my Charger didn't blow a tire. Take me to 49th Street. Y'all know what I did and do. And I'm going away for a long time, so fuck y'all." (Doc. 8-2 at 1362)

Because this evidence convincingly proved that Climes intended to steal the Mazda and willfully fled from police in the Charger, Climes cannot demonstrate a reasonable probability that the outcome at trial would have changed if trial counsel did not concede in opening statements that Climes drove the Mazda. *Magill v. Dugger*, 824 F.2d 879, 888 (11th Cir. 1987); *Messer v. Kemp*, 760 F.2d 1080, 1090–91 (11th Cir. 1985).

Sub-claim A is **DENIED**.

**Sub-claim B**

Climes asserts that trial counsel deficiently performed by failing to move under *Miranda v. Arizona*, 384 U.S. 436 (1966), to suppress his statements to the police

officer during his arrest. (Doc. 1 at 8) The post-conviction court denied the claim as

follows (Doc. 8-2 at 2437–38) (state court record citations omitted):

> Defendant alleges that counsel was ineffective for failing to file a motion to suppress statements. Specifically, Defendant alleges that the following statements made during his arrest should have been suppressed: "Ya'll motherfuckers wouldn't have got me if my Charger tire didn't blow. Take me to 49th Street, ya'll know what I did and do and I'm going away for a long time, so fuck ya'll and I ain't talking to no detectives, I want my lawyer." He contends that this statement was made prior to the administration of the *Miranda*[3] warnings and in response to a law enforcement officer asking Defendant for his name and date of birth. With respect to prejudice, Defendant alleges that had counsel moved to suppress the evidence, "it would have been found inadmissible either under the hearsay doctrine or under *Miranda* violation."
>
> [3] *Miranda v. Arizona*, 384 U.S. 436 (1966).
>
> In Defendant's amended motion, in an attempt to further allege a valid basis existed for a motion for suppress and to demonstrate prejudice, he alleges that he told his counsel he did not remember making the statement. He also alleges that there was no audio or video of this statement.
>
> After reviewing the allegations, the court file, and the record, the court initially finds that Defendant has failed to remedy his claim to demonstrate that there was a valid basis for his counsel to file a motion for suppression and that he was prejudiced by this failure to file. The court finds that "routine booking questions do not require *Miranda* warnings because they are not designed to lead to an incriminating response; rather, they are designed to lead to essential biographical data." *Allred v. State*, 622 So. 2d 984, 987 (Fla. 1993). Officer Corio testified at trial that Defendant made these statements in response to being asked his name and date of birth. The court finds that the officer's question regarding Defendant's name and date of birth constitute "routine booking questions," and as such, a *Miranda* warning is not required before an officer may

63

legally ask these questions. As such, the court finds that there would have been no valid legal basis to file a motion to suppress these statements based on a *Miranda* violation.

The court further finds that during the proffer of Officer Corio's testimony, Defendant requested that the court suppress this statement based on the argument that Defendant did not make the statement. The court denied this request, clarifying with Defendant that a motion to suppress must be based on a legal basis such as a *Miranda* violation, and affirming that Defendant's only objection was to whether or not he actually made this statement at all. The court further finds that when the State questioned Officer Corio regarding the statement that Defendant made, Defendant who was *pro se* at the time[4], failed to object to Officer Corio testifying to the statement on the basis of hearsay.

> [4] Defendant elected to go back to proceeding *pro se* on the last day of the trial, prior to Officer Curio's testimony.

The court further finds that from August 15, 2014, roughly seven months prior to the initiation of the trial, until the second day of trial, March 10, 2015, Defendant was proceeding *pro se* and had ample opportunity to file a motion to suppress these statements. In fact, Defendant did file a motion to suppress regarding this exact matter on November 20, 2014. The court finds that once a defendant decides to proceed *pro se*, he cannot thereafter complain of ineffective assistance of counsel. *See Snodgrass v. Sec'y, Fla. Dep't Corrs.*, No. 3:15-cv-754-TJC-PDB, 2018 WL 4145930 at *5 (M.D. Fla. Aug. 30, 2018).

Accordingly, the court finds Defendant has failed to demonstrate either deficiency or prejudice as required by *Strickland*. As such, the court finds that [the claim] must be denied.

A police officer testified that he arrested Climes and placed him in the back of his police car. (Doc. 8-2 at 1355, 1358) The officer testified that he asked Climes his

64

name, and Climes responded, "Ya'll motherfuckers wouldn't have got me if my Charger didn't blow a tire. Take me to 49th Street. Y'all know that I did and do. And I'm going away for a long time, so fuck y'all." (Doc. 8-2 at 1360–62) The officer denied asking Climes a question about what occurred, denied threatening Climes, and denied promising Climes anything of value to induce his statement. (Doc. 8-2 at 1360–61)

Before the police officer testified, the trial judge did suppress part of the statement because Climes invoked his right to silence and his right to an attorney. (Doc. 8-2 at 1348–51) Because the officer asked Climes a routine booking question and because Climes spontaneously responded with the unsolicited incriminating statement, a motion to suppress would not have succeeded. *Lukehart v. Sec'y, Fla. Dep't Corrs.*, 50 F.4th 32, 44 (11th Cir. 2022) ("Voluntary and spontaneous statements made by a suspect are admissible in evidence whether or not the suspect has previously requested an attorney, as long as the statements are not made in response to questioning by the police."); *Everett v. Sec'y, Fla. Dep't Corrs.*, 779 F.3d 1212, 1242 n.14 (11th Cir. 2015) ("In *Pennsylvania v. Muniz*, 496 U.S. 582 (1990), the Supreme Court recognized a "routine booking exception" to *Miranda*'s coverage for questions to secure the defendant's 'biographical data necessary to complete booking or pretrial services,' such as questions regarding name, address, height, weight, eye color, date of birth, and current age.").

Because trial counsel did not deficiently perform, the post-conviction court did not unreasonably deny the claim. *Pinkney*, 876 F.3d at 1297 ("[A]n attorney will not

be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

Sub-claim B is **DENIED**.

**Sub-claim C**

Climes asserts that trial counsel deficiently performed by failing to move to suppress testimony by the victims identifying Climes as the perpetrator of the crimes. (Doc. 1 at 8) The post-conviction court denied the claim as follows (Doc. 8-2 at 2609–10):

> Defendant alleges that counsel was ineffective for failing to move to suppress the identification testimony of victims Angella Jackson, Jeremy Reed, and Anna Soto. Defendant argues that all of the victims identified him as the person who committed the offenses in this case after they were subjected to suggestive show-ups. He claims that had counsel filed such a motion, the motion would have been granted.
>
> To establish a claim for ineffective assistance of counsel based on the failure to file a motion to suppress, a defendant must demonstrate that counsel knew a valid basis existed to suppress relevant evidence[;] yet counsel failed to file the appropriate motion. *See Harrison v. State*, 562 So. 2d 827, 827–28 (Fla. 2d DCA 1990). When considering a motion to suppress an out-of-court identification, the court considers "(1) whether the police used an unnecessarily suggestive procedure to obtain the out-of-court identification; and (2) if so, considering all the circumstances, whether the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." *Fitzpatrick v. State*, 900 So. 2d 495, 517–18 (Fla. 2005) (quoting *Rimmer v. State*, 825 So. 2d 304, 316 (Fla. 2002)).
>
> In determining the likelihood of misidentification, the court considers the following factors:

66

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* (quoting *Neil v. Biggers*, 409 U.S. 188, 199 (1972)). Although a show-up is inherently suggestive because a witness is only presented with one suspect for identification, it is not invalid if it does not give rise to the substantial likelihood of irreparable misidentification. *Perez v. State*, 648 So. 2d 715, 719 (Fla. 1995). For clarity, the court subdivided [the ground] into separate claims.

**Angella Jackson**

The post-conviction court denied the claim as to the identification testimony by Jackson as follows (Doc. 8-2 at 2610–11) (state court record citations omitted):

> Defendant alleges counsel was ineffective for failing to move to suppress the identification testimony of Angella Jackson. In its response, the State argues a motion to suppress would have been meritless, because Ms. Jackson freely admitted at trial that she had incorrectly identified Defendant at the show-up. The State argues that any failure to file the motion did not affect the outcome of the trial.
>
> First, the court notes that on November 24, 2014, while Defendant was proceeding *pro se*, Defendant filed an addendum to his previously filed demand to suppress, arguing that the pretrial identification made by Angella Jackson was "so suggestive and conducive to irreparable mistaken identification."
>
> "[A] defendant who represents himself has the entire responsibility for his own defense, even if he has standby counsel. Such a defendant cannot thereafter complain that the quality of his defense was a denial of 'effective

assistance of counsel.'" *Behr v. Bell*, 665 So. 2d 1055, 1056–57 (Fla. 1996) (internal citations omitted). Further, Angella Jackson testified at trial that her out-of-court identification of Defendant was a mistake. Counsel cross examined Ms. Jackson regarding her misidentification of Defendant, and Ms. Jackson stated that Defendant was never in her house. The court notes that the State charged Defendant as a principal to the burglary of Ms. Jackson's home. The State argued [in] closing that Defendant never entered Ms. Jackson's home, but he was waiting for co-defendant Anthony Stewart as the get-away driver of the Dodge Charger. Testimony and evidence were presented at trial to support this argument. After reviewing Defendant's motion, the State's response, and the record, the Court finds Defendant is not entitled to relief on this claim.

During self-representation before trial, Climes filed a *pro se* motion to suppress the identification by Jackson. (Doc. 8-2 at 145–47) At a pretrial hearing, the trial judge advised that he would rule on any motion to suppress during trial. (Doc. 8-2 at 170–71) After jury selection, the trial judge reminded Climes and standby counsel that he would rule on any motion to suppress during trial. (Doc. 8-2 at 635–36)

Before Jackson testified, Climes asked that standby counsel resume representation. (Doc. 8-2 at 650–53) Trial counsel did not renew Climes's motion to suppress the identification by Jackson. However, at trial, Jackson testified that she woke up in her bed, felt a gun touching her head, and heard a person say, "Bitch, get up." (Doc. 8-2 at 706–07) She testified that she observed Anthony Stewart standing over her. (Doc. 8-2 at 707) She testified that another male entered the room and pointed a gun at her. (Doc. 8-2 at 709–10)

68

Jackson admitted that she mistakenly identified Climes as the other male (Doc. 8-2 at 752–53):

| | |
|---|---|
| [Prosecutor:] | Okay. The other fellow, that night, did you make an identification when they took you to the mall, of the other fellow, as well? |
| [Jackson:] | Uh-huh. |
| [Prosecutor:] | Okay. And that was who? |
| [Jackson:] | Mr. Climes. |
| [Prosecutor:] | Mr. Climes, right? |
| [Jackson:] | Yes. |
| [Prosecutor:] | You have indicated previously that you believe Mr. Climes was the person in the house — |
| [Jackson:] | Yes, sir. |
| [Prosecutor:] | — with Mr. Stewart, correct? |
| [Jackson:] | Yes, sir. |
| [Prosecutor:] | And do you think that's the case today? |
| [Jackson:] | No, sir. |
| [Prosecutor:] | Why not? |
| [Jackson:] | I think that it was a mis — I think that that was a mistake, because I seen him that morning — that evening with Anthony, so I thought maybe that was him in the house. |
| [Prosecutor:] | What do you mean by that, seen him earlier in the day? |

| [Jackson:] | Walking by the house in all black. |
| [Prosecutor:] | The two individuals that you saw coming by? |
| [Jackson:] | Yes, sir. |
| [Prosecutor:] | So you assumed that was him? |
| [Jackson:] | So I assumed, yes, sir. |
| [Prosecutor:] | And he was caught at the mall with the other fellow? |
| [Jackson:] | Yes, sir. |
| [Prosecutor:] | Okay. You offered that up, did you? |
| [Jackson:] | Yes, sir. |
| [Prosecutor:] | That you don't think it was him? |
| [Jackson:] | Yes, sir. |
| [Prosecutor:] | Okay. Now, even though you told the police that night you thought it was him, and in your deposition, you don't think that's the case today? |
| [Jackson:] | No, sir. |

On cross-examination, Jackson further admitted that Climes never entered her home, never pointed a gun at her head, and never demanded money from her. (Doc. 8-2 at 792) Trial counsel very effectively used Jackson's misidentification of Climes to impeach Jackson.

Because Jackson did not ultimately identify Climes as the other male who entered her home, a motion to suppress would not have succeeded. Also, because

70

Climes fails to demonstrate that no reasonable counsel would have chosen to impeach Jackson with her misidentification, instead of filing a motion to suppress, the post-conviction court did not unreasonably deny the claim. *Pinkney*, 876 F.3d at 1297. *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) ("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.").

**Jeremy Reed**

The post-conviction court denied the claim as to the identification testimony by Reed as follows (Doc. 8-2 at 2611–12) (state court record citations omitted):

> Defendant alleges counsel was ineffective for failing to move to suppress the identification testimony of Jeremy Reed. The State argues in its response that a motion to suppress Mr. Reed's identification would have been meritless, and even if granted, there is not a reasonable probability that it would have affected the outcome of the trial. The State argues that the record does not support a finding that police used an unnecessarily suggestive procedure, and the totality of the circumstances do not give rise to a substantial likelihood of misidentification under *Biggers*. Finally, the State argues that even if Mr. Reed had not identified Defendant at trial, there was ample evidence implicating Defendant in the offenses.
>
> First, the court notes that Defendant was *pro se* from prior to trial until after voir dire, and beginning again just before cross-examination of Mr. Reed. Additionally, the court finds that there is not a reasonable probability that a motion to suppress Mr. Reed's identification of Defendant would have been granted. Mr. Reed testified at trial that the house was well lit, and he was able to view Defendant clearly. He testified that he was taken to identify possible suspects approximately twenty minutes after the incident,

and that he was positive of his identification. After reviewing the record, the court finds there is not a substantial likelihood of irreparable misidentification. The court notes that even if the court had suppressed Mr. Reed's identification of Defendant, there is not a reasonable probability that the outcome of the trial would have been different. There was testimony presented at trial indicating that Defendant was arrested while fleeing from Mr. Reed's and Ms. Soto's home after exiting Ms. Soto's Mazda that was stolen during the burglary. The court finds the Defendant is not entitled to relief[.]

Reed testified that he awoke in his bed when he heard a loud bang followed by his fiancé's screams. (Doc. 8-2 at 1144) He testified that he quickly stood up and saw a male with white eyes and gold teeth standing at the foot of the bed. (Doc. 8-2 at 1144) He testified that he grabbed the male and tried to force him out of the bedroom. (Doc. 8-2 at 1145–46) He testified that he was "eye to eye" and "face to face" with the male. (Doc. 8-2 at 1145–46) He testified that, when another male entered the room, he pushed the male with gold teeth into the other male. (Doc. 8-2 at 1146–47) He testified that he pushed both males into an adjacent room where the lights were on and that the males left. (Doc. 8-2 at 1147–49)

Reed testified that he identified Climes as one of the males as follows (Doc. 8-2 at 1172–74):

| [Prosecutor:] | Did you [identify] both of those fellows that night? |
|---|---|
| [Reed:] | Yes, sir. |
| [Prosecutor:] | Police come pick you up? |
| [Reed:] | Yeah. |

[Prosecutor:]     Independent of your fiancé, Ms. Soto?

[Reed:]     Yes.

[Prosecutor:]     [They] take you down to — where was that?

[Reed:]     Applebee's, the mall.

[Prosecutor:]     Pardon?

[Reed:]     Parkside Mall, whatever you call it.

[Prosecutor:]     Did they show individuals?

[Reed:]     Yep.

[Prosecutor:]     Did you recognize them and point out who they were?

[Reed:]     Yes.

[Prosecutor:]     How long after the incident do you think you went down there to pick them out?

[Reed:]     Maybe twenty minutes.

[Prosecutor:]     Pretty easy for you?

[Reed:]     Yeah.

[Prosecutor:]     Why?

[Reed:]     Because I seen them.

[Prosecutor:]     Pretty fresh in your mind?

[Reed:]     Yeah.

[Prosecutor:]     See the fellow in the courtroom with the gold teeth today?

73

[Reed:]              Yeah.

[Prosecutor:]        My question is, do you see him?

[Reed:]              Yes.

[Prosecutor:]        That night, you said you got up close to him, as close as we are, you to me?

[Reed:]              Uh-huh.

[Prosecutor:]        How tall was he compared to you, sir?

[Reed:]              About the same height, maybe a little shorter?

[Prosecutor:]        Can you get to, as close as you were that night, to the fellow you see in this courtroom?

[Reed:]              What's that?

[Prosecutor:]        Will you approach the fellow in this courtroom that you saw that night?

[Reed:]              If you want me to.

[Prosecutor:]        Yes, sir.

                     Judge, I'd ask that the fellow with the gold teeth — Judge, I'm going to ask that the witness position himself in front of Mr. Climes. I would ask that the Court instruct Mr. Climes to stand up.

[Judge:]             Stand up and smile, if you would, Mr. Climes.

[Prosecutor:]        I'm going to ask him to show his teeth, as well, Your Honor.

[Judge:]             Thank you.

74

| [Prosecutor:] | Is that how you were looking at him, face to face? |
|---|---|
| [Reed:] | Yeah. |
| [Prosecutor:] | Is that the fellow? |
| [Reed:] | Yeah. |
| [Prosecutor:] | Any doubt in your mind? |
| [Reed:] | No. |
| [Prosecutor:] | Why is that? |
| [Reed:] | Because I seen him. |

On cross-examination, Climes, who proceeded *pro se*, very effectively cross-examined Reed about his ability to observe the male who entered his bedroom. Reed admitted that he did not observe any facial hair on the male's face. (Doc. 8-2 at 1237) He did not observe how the male's hair was styled. (Doc. 8-2 at 1237) He did not observe any hat or hooded sweatshirt that the male was wearing. (Doc. 8-2 at 1238) He did not remember how he described the male to police officers on the evening of the crimes. (Doc. 8-2 at 1242–43) He admitted that, before his identification, the officers told him that they had caught the males who committed the crimes. (Doc. 8-2 at 1244)

"The Constitution [ ] protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire*, 565 U.S. 228, 237

(2012). "[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry*, 565 U.S. at 238–39. "Even when the police use such a procedure, [ ] suppression of the resulting identification is not the inevitable consequence." *Perry*, 565 U.S. at 239.

"Instead of mandating a *per se* exclusionary rule, [ ] the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Perry*, 565 U.S. at 239 (quoting *Neil v. Biggers*, 409 U.S. 188, 201 (1972)). "Where the 'indicators of [a witness's] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." *Perry*, 565 U.S. at 239 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114, 116 (1977)). "Otherwise, the identification, assuming no other barrier to its admission, should be submitted to the jury." *Perry*, 565 U.S. at 239.

Reed admitted that the police officers told him, before his identification, that they had apprehended the perpetrators of the crimes. (Doc. 8-2 at 1244) However, as the post-conviction court reasoned, (Doc. 8-2 at 2612), even if a motion to suppress would have succeeded, Climes cannot demonstrate prejudice under *Strickland*.

The trial judge instructed that the jury could find Climes guilty as a principal if he assisted another person to commit the crimes. (Doc. 8-2 at 1784–85) A police officer testified that he followed Soto's stolen Mazda at a high rate of speed and observed the driver exit the Mazda. (Doc. 8-2 at 1070–71) Another officer prevented the driver from stealing another car, took the driver into custody, and identified

76

Climes as the driver. (Doc. 8-2 at 888–90, 975–79, 1070–71, 1355) The officer testified that he asked Climes his name, and Climes responded, "Y'all motherfuckers wouldn't have got me if my Charger didn't blow a tire. Take me to 49th Street. Y'all know what I did and do. And I'm going away for a long time, so fuck y'all." (Doc. 8-2 at 1362) A third officer identified Stewart as the passenger of the Mazda. (Doc. 8-2 at 896–98)

Because this testimony convincingly proved that Climes at least assisted with the burglary of Reed and Soto's home by driving the stolen Mazda just after the burglary occurred, Climes cannot demonstrate a reasonable probability that the outcome at trial would have changed if trial counsel had successfully moved to suppress the identification testimony. Consequently, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 649.

**Anna Soto**

The post-conviction court denied the claim as to the identification testimony by Soto as follows (Doc. 8-2 at 2612) (state court record citations omitted):

> Defendant asserts counsel was ineffective for failing to move to suppress the identification testimony of Anna Soto. The State argues in its response that a motion to suppress Ms. Soto's identification would have been meritless and, even if successful, it would not have affected the outcome of the trial. The State argues there is no basis to conclude that police employed an unnecessarily suggestive procedure or that the totality of the circumstances gives rise to a substantial likelihood of misidentification under *Biggers*. Finally, the State argues that even if Ms. Soto's identification had been excluded in its entirety, there was ample evidence of Defendant's guilt.

77

As the court has previously noted, Defendant was *pro se* prior to trial and again prior to Anna Soto's testimony. Further, the court finds there is not a substantial likelihood of irreparable misidentification. Ms. Soto testified at trial that she was able to get a good look at Defendant because the room was well lit, and Defendant was standing at the end of her bed. Ms. Soto testified that she was taken to possibly identify a suspect two or three hours after the incident. She testified that she recognized Defendant's orange shorts, white t-shirt, gold teeth, and beard. Ms. Soto testified that she was sure it was Defendant in her home that night. Finally, as noted above, even if the court had suppressed the identification of Defendant by Ms. Soto, there is not a reasonable probability that the outcome of the proceeding would have been different. Defendant was arrested shortly after the offenses while fleeing from Ms. Soto's stolen Mazda. After reviewing the record, the court finds the Defendant is not entitled to relief[.]

Soto testified that she awoke in her bed after hearing a loud bang and yelled Reed's name. (Doc. 8-2 at 1265–66) She testified that Reed stood up from the bed and confronted a male at the end of their bed who yelled, "We have guns." (Doc. 8-2 at 1267–68) She saw that the male had gold teeth and wore bright-orange shorts. (Doc. 8-2 at 1270–71) She saw Reed and the male pushing each other. (Doc. 8-2 at 1272–73) She testified that she grabbed her telephone and hid in a closet with her newborn baby. (Doc. 8-2 at 1269) She denied seeing the other male intruder's face and only heard his voice. (Doc. 8-2 at 1273–74)

Soto testified that the lights were on in a room adjacent to their bedroom. (Doc. 8-2 at 1268, 1278) Also, she testified that a closet light and another light in their bedroom were on. (Doc. 8-2 at 1278) She testified that she "absolutely" was able to observe the male and identified Climes as the male. (Doc. 8-2 at 1279) She

identified the bright orange shorts that the male wore in a photograph of Climes taken by police on the evening of the crimes. (Doc. 8-2 at 1279–80)

On direct examination, the prosecutor did not ask Soto about her pretrial identification of Climes. On cross-examination, Climes, who proceeded *pro se*, first asked Soto about the pretrial identification. In response to Climes's questions, Soto testified that, about two or three hours after the crimes, she identified the male intruder. (Doc. 8-2 at 1286) She testified that police officers told her that two suspects were in custody and asked her if she could identify either suspect. (Doc. 8-2 at 1286–87) She did not testify that she identified Climes as one of the suspects. (Doc. 8-2 at 1286–87) On redirect examination, only after Climes opened the door to the admission of evidence about the pretrial identification, Soto testified that police showed her more than one suspect, that she identified Climes as the male intruder, and that she was certain about her identification. (Doc. 8-2 at 1290–91)

Because Climes, who insisted on representing himself, opened the door to the admission of evidence about Soto's pretrial identification, the ineffective assistance of counsel claim is meritless. *United States v. Roggio*, 863 F.2d 41, 43 (11th Cir. 1989) ("'[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel.'") (quoting *Faretta*, 422 U.S. at 834 n.46). *Edwards-Freeman v. State*, 93 So. 3d 497, 500 (Fla. 4th DCA 2012) ("The evidentiary principle of 'opening the door'[ ] allows the admission of otherwise inadmissible testimony to qualify, explain, or limit testimony or evidence previously admitted.").

Also, "show-ups are not unnecessarily suggestive unless the police aggravate the suggestiveness of the confrontation." *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987) (citation omitted). "Although show-ups are widely condemned, immediate confrontations allow identification before the suspect has altered his appearance and while the witness's memory is fresh, and permit the quick release of innocent persons." *Johnson*, 817 F.2d at 729. "Factors considered in determining reliability include 'the opportunity to view the witness at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Johnson*, 817 F.2d at 729 (quoting *Neil*, 409 U.S. at 199).

Soto testified that the lights were on in the room adjacent to their bedroom and two lights were on in the bedroom. (Doc. 8-2 at 1278) She testified that she "absolutely" was able to observe the male. (Doc. 8-2 at 1279) She identified the bright orange shorts that the male wore. (Doc. 8-2 at 1279–80) She testified that she identified Climes as the male intruder two or three hours after the crimes. (Doc. 8-2 at 1286) Because four of the five factors identified in *Neil* support the reliability of Soto's identification, a motion to suppress would not have succeeded. Consequently, trial counsel did not deficiently perform. *Pinkney*, 876 F.3d at 1297.

Lastly, because a police officer identified Climes as the male who drove Soto's stolen Mazda, Climes cannot demonstrate a reasonable probability that the outcome at trial would have changed if trial counsel had moved to suppress Soto's

identification testimony. Consequently, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 694.

Sub-claim C is **DENIED**.

**Sub-claim D**

Climes asserts that trial counsel deficiently performed by failing to move for a statement of particulars on the charge for fleeing and eluding a law enforcement officer. (Doc. 1 at 8) The post-conviction court denied the claim as follows (Doc. 8-2 at 2441–42) (state court record citations omitted):

> Defendant alleges that counsel was ineffective for failing to file a motion for statement of particulars on count five, fleeing to elude. He contends that there were two different car chases in two different vehicles with law enforcement officers from different agencies. He claims that had counsel filed a motion for statement of particulars, the State would have been obligated to provide the defense with the type of vehicle that was the subject of the fleeing to elude charge. Defendant further claims that because counsel did not file this motion, he was unable to prepare a proper defense to count five.
>
> In an attempt to further allege prejudice in his amended motion, Defendant alleges that because the State was able to present evidence regarding both car chases it is unclear whether the jury voted that he was guilty based on the evidence surrounding one chase in particular or if there was a split amongst the jury.
>
> After reviewing the allegations, the court file, and the record, the Court finds that Defendant's claim is facially insufficient as he has failed to adequately allege prejudice. The court finds that Defendant has failed to indicate how clarifying which car chase the State was relying on through a statement of particulars would have helped Defendant prepare a proper defense to count five. As such, the court finds that [the claim] must be denied.

In his amended motion, Climes alleged the following in support of this claim

(Doc. 8-2 at 2418–20):

> Early in the pretrial stages Defendant notified counsel that there [were] two chases that accrued and he didn't understand which of the chases was charged within the information[;] counsel told defendant she would get to the bottom of it, but failed to do so.
>
> Defendant was charged by information with one count of fleeing or eluding, but at trial the State argued and entered evidence pertaining to a different fleeing or eluding that occurred in two different vehicles and different law enforcement was employed due to the different jurisdictions these fleeings took place. As seen at trial, the Defendant and defense counsel [were] unaware of what chase was charged within the information.
>
> . . .
>
> Defense counsel's failure to file a statement of particulars was deficient performance, where had counsel filed said motion the State would have been obligated to provide the defense with the type of vehicle it was seeking prosecution on in count five.
>
> This deficient performance prejudiced the Defendant where he was unable to prepare a proper defense on count five.
>
> The Defendant was prejudiced where it is basic tenet of Constitutional law that due process is violated when an individual is convicted of a crime not charged in the charging instrument. As a state constitutional matter, a criminal conviction requires a unanimous verdict in Florida.
>
> Trial counsel was aware of the two different chases that took place in two different vehicles well before the commission of trial. Counsel's deficient acts prejudiced the Defendant where she allowed the State to present two

82

different chases to the jury while only charging the
Defendant with one count of fleeing or eluding[;] this
makes the unanimity of the jury's verdict questionable, as
some members of the jury could have determined that one
incident constituted fleeing or eluding, while others on the
jury could have determined that the other incident
constituted fleeing or eluding, rather than agreeing
unanimously that the same incident constituted fleeing or
eluding.

While the presentation of dual theories of a crime is
allowable, this occurs when a defendant is charged with
the commission of one crime, and the State presents two
scenarios or bases supporting the commission of the crime.
*See Mackerley v. State*, 777 So. 2d 969 (Fla. 2001). In the
instant case, the State charged Climes with one count of
fleeing or eluding, but presented evidence of two entirely
separate incidents, separated by both time and place. By
allowing the State to present this case to the jury within
this manner, trial counsel compromised the jury's ability
to render a unanimous verdict. Had counsel filed the
appropriate motion it would have changed the outcome of
the trial.

Because the post-conviction court unreasonably determined that Climes failed to

allege prejudice under *Strickland* in his amended motion, the Court reviews the claim

*de novo*. 28 U.S.C. § 2254(d)(2). *King*, 69 F.4th at 867.

The second amended information charged Climes with fleeing and eluding as

follows (Doc. 8-2 at 43):

And the State Attorney aforesaid, under oath as aforesaid,
further information makes that Maurice E. Climes, in the
County of Pinellas, State of Florida, on the 9th day of
December, in the year of our Lord, two thousand twelve,
did operate a motor vehicle and fail to stop such vehicle
having knowledge that he had been directed to stop by a
law enforcement officer, or having stopped, did willfully
flee in an attempt to elude a law enforcement officer, who
at the time was in an authorized law enforcement vehicle

83

with agency insignia and other jurisdictional markings prominently displayed with siren and lights activated; and during the course of the fleeing or attempted eluding, did drive at a high speed, or in any manner which demonstrated a wanton disregard for the safety of persons or property; contrary to Chapter 316.1935(3)(a), Florida Statutes, and against the peace and dignity of the State of Florida.

Rule 3.140(n), Florida Rules of Criminal Procedure, requires a trial judge to direct the prosecutor to file a statement of particulars if the information fails to sufficiently inform the defendant of the nature of the offense:

The court, on motion, shall order the prosecuting attorney to furnish a statement of particulars when the indictment or information on which the defendant is to be tried fails to inform the defendant of the particulars of the offense sufficiently to enable the defendant to prepare a defense. The statement of particulars shall specify as definitely as possible the place, date, and all other material facts of the crime charged that are specifically requested and are known to the prosecuting attorney, including the names of persons intended to be defrauded. Reasonable doubts concerning the construction of this rule shall be resolved in favor of the defendant.

The evidence at trial proved that, after the first robbery, Climes fled in a Dodge Charger from police officers who drove in marked cars with lights and sirens activated. Also, the evidence proved that, after the second robbery on the same day, Climes fled in a stolen Mazda from more police officers who drove in marked cars with lights and sirens activated. The evidence demonstrated that Climes drove dangerously fast during both flights.

Under Florida law, the statute that criminalizes fleeing and eluding a law enforcement officer "permit[s] multiple prosecutions when a defendant flees or

84

attempts to elude more than one law enforcement officer, even if all of the proscribed acts occur during a single episode." *State v. Mitchell*, 719 So. 2d 1245, 1248 (Fla. 1st DCA 1998). For a single offense that a defendant may commit by one or more different acts, an information may allege in the alternative each act. Fla. R. Crim. P. 3.140(k)(5). However, the information in Climes's case did not separately identify the flight after the first robbery and the flight after the second robbery. *See Saldana v. State*, 980 So. 2d 1220, 1221 (Fla. 2d DCA 2008).

Yet, a police officer testified that he observed the driver of the stolen Mazda exit the car. (Doc. 8-2 at 1070–71) Another officer prevented the driver from stealing another car, took the driver into custody, and identified Climes as the driver. (Doc. 8-2 at 888–90, 975–79, 1070–71, 1355) Also, a police officer found a key in Climes's pocket that started the abandoned Dodge Charger. (Doc. 8-2 at 1004–05, 1375–76) Fingerprints on duct tape inside the Dodger Charger matched Climes's fingerprints. (Doc. 8-2 at 1419–20) DNA profiles from swabs of the steering wheel, inside door handle, and gear shifter of the Dodger Charger matched Climes's DNA profile. (Doc. 8-2 at 1502–03, 1518) An officer testified that he asked Climes his name, and Climes responded, "Y'all motherfuckers wouldn't have got me if my Charger didn't blow a tire. Take me to 49th Street. Y'all know what I did and do. And I'm going away for a long time, so fuck y'all." (Doc. 8-2 at 1362)

This evidence overwhelmingly proved that Climes fled from police officers in both the Dodge Charger and the stolen Mazda. Even if the trial judge granted a motion for a statement of particulars and required the prosecutor to identify which

85

police pursuit that the fleeing and eluding count charged, Climes fails to demonstrate a reasonable probability the outcome at trial would have changed. Because Climes cannot demonstrate prejudice under *Strickland*, the claim is meritless. *Strickland*, 466 U.S. at 694.

Sub-claim D is **DENIED**.

**Sub-claim E**

Climes asserts that trial counsel deficiently performed by failing to introduce exculpatory evidence during the cross-examination of the prosecutor's witnesses. (Doc. 1 at 8) The post-conviction court denied the claim as follows (Doc. 8-2 at 2612–14) (state court record citations omitted):

> Defendant alleges that counsel was ineffective for failing to obtain and enter exculpatory evidence during the cross-examinations of state witnesses Angella Jackson and Anthony Poole. Specifically, Defendant alleges that counsel failed to show these witnesses a picture of Arsenio Brinson, who looks similar to Defendant, and whose DNA was found outside Ms. Jackson's home. He argues that had counsel shown Ms. Jackson the picture of Brinson, it would have connected Brinson to both houses and would show that Ms. Jackson, Mr. Reed, and Ms. Soto misidentified Defendant because he looked similar to Brinson. Defendant claims that the introduction of this photograph would have put reasonable doubt within the jurors' minds, and the outcome of the trial would have been different.
>
> In its response, the State argues that counsel cannot be deemed ineffective for failing to attempt to cross-examine a witness in a manner not permitted by the rules of evidence. The State argues that Ms. Jackson and Mr. Poole both denied knowing anyone named Arsenio Brinson, and therefore could not have authenticated the photographs. The State argues that by the time the photographs had been

86

properly authenticated and entered into evidence, Defendant was once again representing himself. The State further argues that there is not a reasonable probability that this alleged error affected the outcome of the trial. First, the State argues Mr. Poole never identified any suspects involved in the burglary because he was outside the entire time. Further, the State asserts that even if Ms. Jackson had identified Mr. Brinson as being the second intruder in her home, it would not have exculpated Defendant as being the getaway driver.

Although counsel was representing Defendant at the time Ms. Jackson and Mr. Poole testified, the photographs of Mr. Brinson had not yet been introduced. The court and the parties had a lengthy discussion regarding how Defendant would be able to introduce Mr. Brinson's photographs, and the State refused to stipulate to their admission without testimony from either a records custodian or Defendant. Defendant then introduced photographs of Arsenio Brinson as Defense Exhibit Three through the records custodian of the Pinellas County Jail. However, Defendant was *pro se* at the time these photographs were introduced, and he did not recall Ms. Jackson or Mr. Poole to question them regarding the photographs of Mr. Brinson. Defendant did argue during closing that it was Arsenio Brinson, and not Defendant, who committed the offenses in this case. Additionally, the court finds there is not a reasonable probability that the outcome of the trial would have been different had counsel questioned Ms. Jackson and Mr. Poole regarding these photographs. Mr. Poole was unable to identify any suspects in this case. Further, even if Ms. Jackson had testified that she recognized Mr. Brinson as the second suspect in her home that night, it would not exonerate Defendant. Testimony presented at trial indicated that there were two suspects in Ms. Jackson's home, and the State presented testimony and argued that Defendant was acting as the getaway driver of the Dodge Charger.

Climes did not present an affidavit or testimony by Angella Jackson and Anthony Poole to demonstrate that both witnesses would have identified Arsenio

87

Brinson as the male who entered the home. "Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation." *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985).

Even though trial counsel represented Climes when Jackson and Poole testified (Doc. 8-2 at 779–94, 835–54), trial counsel could not have introduced the photograph of Brinson during cross-examination. Under Florida law, "'the defendant may not use cross-examination as a vehicle for presenting defensive evidence.'" *Pierre v. State*, 990 So. 2d 565, 569 (Fla. 3d DCA 2008) (quoting *Steinhorst v. State*, 412 So. 2d 332, 337 (Fla. 1982)). Consequently, trial counsel did not deficiently perform.

During the defense case-in-chief, Climes chose to represent himself and called a records custodian who authenticated the photograph of Brinson. (Doc. 8-2 at 1584–85) Climes did not recall Jackson and Poole to cross-examine them with the photograph. Because "'[a] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel,'" the ineffective assistance of counsel claim is meritless. *Roggio*, 863 F.2d 41, 43 (quoting *Faretta*, 422 U.S. at 834 n.46).

During her testimony at trial, Jackson admitted that she mistakenly identified the other male as Climes and testified that Climes was not inside her home. (Doc. 8-2 at 752–53, 792) Poole, who was Jackson's boyfriend, testified that, he was not home when the two males entered the home to commit the crimes. (Doc. 8-2 at 808–11) Poole testified that he called the police after driving to the home, observing

two males inside the home, and receiving a text from Jackson identifying the males as robbers. (Doc. 8-2 at 811–12, 818–19) Poole testified that, when police arrived, he remained in his car parked in the middle of the road. (Doc. 8-2 at 831)

Because Climes speculates that Jackson and Poole would have identified Brinson as one of the males who entered the home, Climes fails to demonstrate a reasonable probability that the outcome at trial would have changed if trial counsel had cross-examined the witnesses with the photograph of Brinson. *Strickland*, 466 U.S. at 694. Consequently, the post-conviction court did not unreasonably deny the claim. *Aldrich*, 777 F.2d at 636.

Sub-claim E is **DENIED**.

**Sub-claim G**

Climes asserts that trial counsel deficiently performed by failing to object to the prosecutor's opening statement and to testimony by police officers that supported the conviction for fleeing and eluding a law enforcement officer. (Doc. 1 at 8) The post-conviction court denied the claim as follows (Doc. 8-2 at 2614–15):

> Defendant alleges ineffective assistance of counsel for failure to object to both the State's opening statement and to the testimony provided by Officers Gosnell and Turner. Defendant contends that in the State's opening statement and the two officers' testimonies there was information adduced regarding two car chases. Defendant contends that had his counsel objected there is a strong probability that the outcome of the trial would have been different.
>
> In Defendant's amendment to [the claim], he further argues that all evidence adduced at trial related to the car chase involving the Mazda should have been objected to because this was inadmissible collateral crime evidence.

89

Defendant contends that because counsel failed to object to the admission of this evidence, the jury was able to consider evidence of an uncharged crime in finding him guilty of the charge of fleeing and eluding.

In its response, the State argues both car chases were inextricably intertwined and highly relevant to explaining the series of events that encompassed all charges for both Defendant and his co-defendant. The State further argues that Defendant's claim that the jurors may not have unanimously agreed about which car chase — the Charger or the Mazda — amounted to the fleeing or eluding charge is purely speculative.

At trial, testimony was presented to establish that Defendant, along with two other suspects, fled Angella Jackson's home, the scene of the first burglary, in a silver Dodge Charger. Evidence was further presented that Defendant abandoned the Charger in a neighborhood, after it became disabled. It was clear from the record that Defendant and co-defendant Anthony Stewart entered Jeremy Reed's and Anna Soto's home in search of keys for another vehicle. The police chase continued with Ms. Soto's stolen Mazda.

Evidence that is inextricably intertwined with the crime charged is admissible under Section 90.402 of Florida Statutes, which provides that all relevant evidence is admissible, except as provided by law, because it is a relevant and inseparable part of the act at issue and is necessary to adequately describe the deed. *Griffin v. State*, 639 So. 2d 966 (Fla. 1994). "Evidence is inextricably intertwined if the evidence is necessary to (1) adequately describe the deed; (2) provide an intelligent account of the crime(s) charged; (3) establish the entire context out of which the charged crime(s) arose, or (4) adequately describe the events leading up to the charged crimes." *McGee v. State*, 19 So. 3d 1074, 1078 (Fla. 4th DCA 2009) (citing *Dorsett v. State*, 944 So. 2d 1207, 1213 (Fla. 3d DCA 2006)). Testimony regarding the police chase with the two vehicles was inextricably intertwined evidence of a continuing criminal episode. The testimony was admissible, as it was necessary to establish the entire

90

> context out of which the offenses arose. Therefore, counsel was not ineffective for failing to object to its admission, and [the claim] is denied.

Whether collateral evidence is inextricably intertwined with evidence of the charged crimes is an issue of state law. A state court's determination of state law receives deference in federal court. *Pinkney*, 876 F.3d at 1295 ("[A]lthough 'the issue of ineffective assistance — even when based on the failure of counsel to raise a state law claim — is one of constitutional dimension,' we 'must defer to the state's construction of its own law' when the validity of the claim that [ ] counsel failed to raise turns on state law.").

Even if the prosecutor intended to charge Climes with fleeing and eluding law enforcement only for the police chase in the Dodge Charger, the trial judge could reasonably have admitted evidence of the police chase in the stolen Mazda as inextricably intertwined evidence. Evidence of the police chase in the stolen Mazda was necessary to both describe a chain of events and demonstrate Climes's consciousness of guilt. *Morlas v. State*, 211 So. 3d 286, 291 (Fla. 4th DCA 2017).

Climes and Stewart stole the Mazda from Reed and Soto only after police disabled the Dodge Charger. The males used the stolen Mazda to continue their flight from police after the first robbery. Also, a police officer testified that he observed the driver of the stolen Mazda jump out of the car and attempt to flee. (Doc. 8-2 at 1070–71) Another police officer identified Climes as the driver. (Doc. 8-2 at 1071, 1355) The officer testified that he asked Climes his name, and Climes responded, "Y'all motherfuckers wouldn't have got me if my Charger didn't blow a tire. Take

91

me to 49th Street. Y'all know what I did and do. And I'm going away for a long time, so fuck y'all." (Doc. 8-2 at 1362)

Because an objection to both the prosecutor's statements in opening about the chase in the stolen Mazda and testimony during trial about the chase would not have succeeded, trial counsel did not deficiently perform. Consequently, the post-conviction court did not unreasonably deny the claim. *Pinkney*, 876 F.3d at 1297. *Morlas*, 211 So. 3d 286, 291 ("As the car chase was part of a continuing chain of chronological events, evidence of the chase was relevant and admissible as inextricably intertwined evidence, necessary 'to provide an intelligent account of the crime(s) charged.' It was also relevant and admissible as part of the State's effort to establish Appellant's consciousness of guilt . . . .").

Sub-claim G is **DENIED**.

**Sub-claim F**

Climes asserts that cumulative error arose from trial counsel's deficient performance. (Doc. 1 at 8) Because the individual claims of error are meritless, the cumulative error claims are also meritless. *Morris v. Sec'y, Dep't Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012) ("This Court has made clear that where '[t]here [is] no error in any of the [trial] court's rulings, the argument that cumulative trial error requires that this Court reverse [the defendant's] convictions is without merit.'").

Sub-claim F is **DENIED**.

Accordingly, Climes's petition (Doc. 1) is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Climes and **CLOSE** this case.

## DENIAL OF CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Climes neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on February 4, 2026.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

93